# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7620 | **DATE** | 10/29/2001 |
| **CASE TITLE** | Interclaim Holdings Limited vs. Ness, Motley, Loadholt, Richardson and Poole | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Ness Motley's motion to dismiss (25-1) is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

| | courtroom deputy's initials |
|---|---|
| ETV | |

number of notices: 2

date docketed: OCT 30 2001

docketing deputy initials

date mailed notice: 10/29/2001

ETV mailing deputy initials

**Document Number**

31

FILED FOR DOCKETING
01 OCT 29 PM 3:16

Date/time received in central Clerk's Office


# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| INTERCLAIM HOLDINGS LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00 C 7620 |
| | ) | |
| NESS, MOTLEY, LOADHOLT, | ) | Judge Rebecca R. Pallmeyer |
| RICHARDSON AND POOLE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In late 1999 and early 2000, Interclaim Holdings Limited and Interclaim Recovery Limited ("Interclaim") retained the law firm of Ness, Motley, Loadholt, Richardson & Poole ("Ness Motley") as its counsel to bring class action proceedings on behalf of victims of a complex criminal network run by James Blair Down and others (hereinafter "Down" or "Down Group"). Without notice to or consent from Interclaim, Ness Motley initiated settlement talks with Down and, on demand from Down, excluded Interclaim from participation in the talks or any recovery. Ness Motley officially terminated the attorney-client relationship with Interclaim in September of 2000, citing Down's demand that Interclaim be excluded from any settlement discussions as creating a conflict of interest precluding Ness Motley's continued representation of Interclaim. In its lawsuit, Interclaim alleges that Ness Motley breached its fiduciary duty to Interclaim, misappropriated confidential information, and breached the retainer agreement between the parties. Now before the court is Defendant Ness Motley's motion to dismiss Interclaim's amended

complaint for failure to state a claim. For the reasons stated herein, the motion to dismiss is denied.

## FACTUAL BACKGROUND

To understand Plaintiff's claims, the court reviews the complaint in some detail, accepting Plaintiff's allegations as true for purpose of this motion. From 1989 to 1998, James Blair Down and others operated a complex network of associated corporations based in Canada and Barbados ("criminal enterprise"). (Complaint ¶ 6.) Through this network, Down engaged in the illegal use of mass mail solicitation and telemarketing to sell shares or other interests in large pools of foreign and domestic lottery tickets and other contests. Down directed the solicitations to elderly citizens or others in declining mental or physical health. (*Id.*) An estimated one million individuals paid more than $200 million to the criminal enterprise, which funds were transferred to foreign and domestic bank accounts to be laundered and invested around the world. (*Id.*)

The Down Group is no stranger to the law. Canadian and American officials investigated the criminal enterprise and as early as 1989, Canadian officials enjoined it from selling interests in lottery tickets because the contracts used to effectuate the sales constituted unregistered securities. (*Id.* ¶ 7.) In 1997, the U.S. Postal Inspection Service and U.S. Attorney brought a federal civil enforcement action against the enterprise in New Jersey. (*Id.*) That same year, the Illinois Attorney General's office brought a consumer fraud action against one of the Barbados offshore associated entities of the criminal enterprise. (*Id.*) The U.S. Attorney in Seattle also commenced asset forfeiture proceedings against $12.3

million of Down's illicit proceeds. Members of the Down Group pleaded guilty to criminal charges brought by the U.S. Attorney in Seattle in 1998, and were enjoined from operating their schemes. (*Id.*)

Plaintiff Interclaim acquires and enforces complex, multi-jurisdictional liquidated claims, judgments, or debts, paying the owners of such claims cash or a contingent amount payable upon successful enforcement. (*Id.* ¶ 8.) Interclaim then dedicates resources necessary to investigate and enforce the claims. (*Id.*) In June of 1998, after being contacted by the Miami office of the Federal Bureau of Investigation, Interclaim agreed to help recover the monies lost by hundreds of thousands of U.S. citizens to the Down Group's enterprise. (*Id.* ¶ 9.) Interclaim successfully identified an estimated $100 million of laundered proceeds in more than fifteen countries. (*Id.*) Between October and December 1998, Interclaim entered into power of attorney agreements with sixteen of the Down Group's victims. (*Id.* ¶ 10.) The agreements authorized Interclaim to prosecute the victims' claims and recover monies obtained illegally. (*Id.*) The agreements specifically provided that the "Claim owner appoints Interclaim to be the attorney-in-fact for Claim owner, with plenary authority to prosecute the Claim as it deems best, and for the purpose of instructing counsel, causing suits to be filed to enforce the claim and to take whatever other action whatsoever it seems needful to enforce the claim." (Power of Attorney Agreement, Ex. A to Complaint, ¶ 7.)

In October and November of 1998, Interclaim purchased approximately $670,000 of outstanding trade debt owed by the Down Group to a data processing and mass mailing company, a printing company, and a telephone company.

(Complaint ¶ 11.) Through this purchase, Interclaim acquired an electronic list of 418,256 names and addresses of victims of the criminal enterprise, providing a detailed account of the Down Group's misdeeds during late 1997 and early 1998. (*Id.*)

Interclaim eventually retained Canadian law firms to commence involuntary bankruptcy proceedings against the Down Group in Vancouver, British Columbia and Calgary, Alberta. In 1998, Interclaim filed the bankruptcy petitions on behalf of the 16 individuals for whom Interclaim held power of attorney agreements and all other victims of the criminal enterprise. (*Id.* ¶ 12.) At Interclaim's request, the court appointed Arthur Anderson, Inc. ("Anderson") as interim receiver and approved an International Claims Enforcement Agreement between Interclaim and Anderson. (*Id.* ¶ 13.) Under that agreement, Interclaim was committed to fund the operations of Anderson with up to $3 million of cash and bonds and also to provide Anderson with expert and specialized services in identifying, locating, and recovering the illicit proceeds worldwide. (*Id.*) In return, Interclaim would receive a return of its direct costs up to $2 million, plus fifty percent of any assets recovered in the bankruptcy up to a maximum of fifty percent of the proven claims of creditors. (*Id.*) Through their joint efforts in seven jurisdictions in December of 1998 and January of 1999, Interclaim and Anderson successfully preserved tens of millions of dollars of the Down Group's assets worldwide with an estimated net worth of $50 to $60 million. (*Id.* ¶ 14.) In June to August of 1999, Interclaim also received powers of attorney from 13 additional victims bringing the total victims, directly represented by Interclaim to 29. (*Id.* ¶ 15.)

Things did not go well in the Canadian courts. In August of 1999, the bankruptcy proceedings were dismissed on the basis that the powers of attorney and trade debt purchase agreements violated the English common law doctrine against champerty, though the Bankruptcy Court invited the appellate court to revisit the ancient law.[1] In November 1999, the Alberta court struck the class action portion of Interclaim's representative proceeding on grounds that Alberta lacks a class action procedure. (*Id.* ¶ 17.) In January 2000, the Alberta court drastically reduced the amount of the Down Group's frozen assets concerning the representative proceeding but maintained the asset preservation power of Anderson with respect to the other pending bankruptcy proceeding. (*Id.*)

In the face of these setbacks, Interclaim decided to explore new avenues of recovery against the Down Group on behalf of Interclaim, Interclaim's 29 represented victims, and the victim class generally. (*Id.* ¶ 18.) Interclaim determined to commence class action proceedings in the United State with the aims of (1) getting a judgment from an American court; (2) filing that judgment with the British Columbia bankruptcy court as an enforceable debt, thereby facilitating the liquidation of Down's assets for the benefit of the bankruptcy estate; (3) securing the victim class members' dividend share from the bankruptcy court; and (4) returning this dividend to the American court for dispensation to the victim class. (*Id.*)

---

[1] Dismissal of the case on the champerty ground was ultimately reversed on appeal in January 2001 but the immediate effect of the ruling jeopardized the likelihood of recovering illegally obtained monies from the Down Group. (Complaint ¶ 16.)

To carry out this plan, Interclaim retained Ness Motley and directed the firm to bring class action proceedings on behalf of the victims of the criminal enterprise. (*Id.* ¶ 19.) Interclaim and Ness Motley enacted a retainer agreement on February 14, 2000, whereby Interclaim retained Ness Motley "as its counsel, in both its capacity as (a) an owner of certain trade indebtedness owed by the Criminal Enterprise and (b) as a representative of [29] nominated victims of such enterprise (by and through certain Powers of Attorney) in respect of the pursuit of recovery of loss and damages occasioned to such persons, if any, by reason of the operation of the Criminal Enterprise." (*Id.*; Retainer Agreement, Ex. B to the Complaint (hereinafter "Agreement") § E.) The agreement also provided that, "prior to filing any document or pleading, or disclosing any information in connection with the U.S. Legal Proceedings, [Ness Motley] shall first review such filing with Interclaim's Canadian counsel." (Agreement § 8.0.) Ness Motley's obligations under the retainer agreement were to

> commence legal proceedings in whatever U.S. jurisdiction (or jurisdictions) that is considers appropriate, as against Down, his apparent co-conspirators and, to the extent that it considers appropriate, others, (the U.S. Legal Proceedings) to seek a final money judgment as against Down, his co-conspirators (and possible others) for the liquidated value of the outstanding financial loss and/or damages suffered by the Interclaim Victims and all other victims of the Criminal Enterprise, through the institution of class action proceedings. Ness Motley agrees to prosecute such U.S. Legal Proceedings in the ordinary court and to final end.

(Agreement § 2.0.)

The Agreement also required Ness Motley to "keep all documents and information provided to it by Interclaim in confidence," and directed that

communications between Ness Motley and Interclaim would, to the extent permitted by law, "be protected by attorney-client privilege." (Agreement § 7.0.) Notwithstanding this provision, the agreement authorized Ness Motley "to disclose confidential information conveyed to it by Interclaim to a court or courts in the United States in furtherance of the U.S. Legal Proceedings, as may be reasonably necessary." (*Id.*)

The Agreement required Ness Motley to advance $1 million to cover the cost of mailing notices to the members of the putative class. (Agreement § 3.0.) The parties agreed that Ness Motley would receive 25 percent of the net compensation paid to Interclaim out of the British Columbia bankruptcy estate. (*Id.* § 4.0.) The amount paid to Ness Motley under this provision would be 12.5 percent of the value of the net assets recovered plus whatever compensation Ness Motley would have been entitled to in the U.S. class action proceedings. (Complaint ¶ 23.)

Before finalizing the agreement, Ness Motley consulted an ethics expert to review the arrangement. (*Id.* ¶ 24.) Plaintiff alleges that the expert recognized a possible conflict of interest between Interclaim, Ness Motley, and the putative class as to the reasonableness of the compensation to be paid to Interclaim for services rendered on behalf of the class. (*Id.* ¶ 24.) The parties drafted a provision to address that possibility, which required that before compensation is paid, "the U.S. class shall, at its own cost, retain special, independent outside counsel to represent the U.S. class of Down victims for the express purpose of independently evaluating the reasonableness of Interclaim's compensation." (Agreement § 4.0.) This clause

did not, on its face, call for Ness Motley to withdraw representation of Interclaim in the event of a conflict. (Complaint ¶ 25.)

Ness Motley selected Madison County, Illinois as the venue for the class action proceeding against the Down Group. (*Id.* ¶ 20.) Interclaim provided Ness Motley with a confidential list of 344 individuals who resided in Madison County, and Ness Motley selected the named persons who would act as plaintiffs in the Madison County proceeding. (*Id.*) Ness Motley filed the class action complaint on March 10, 2000 on behalf of these three individuals and all others similarly situated, that is, persons who had received "a solicitation to purchase an interest in a game of chance or other offering from the Down Group," and had made such a purchase. Interclaim continued to provide confidential information to Ness Motley, including memoranda detailing the known evidence against the Down Group, copies of documents from a consumer fraud suit brought in 1997 by the Illinois Attorney General against a Down Group entity, legal memoranda prepared by Interclaim lawyers, and information regarding the nature, value, and location of the Down Group's assets. (*Id.* ¶ 27.)

The British Columbia bankruptcy court set aside its appointment of Anderson on July 28, 2000 because Interclaim failed to present sufficient evidence that its liquidated claims for restitution were "debts" under the Canadian Bankruptcy Act. (*Id.* ¶ 28.) The Court of Appeals granted a stay pending review, but Interclaim and Ness Motley were concerned that the stay might be lifted, thereby releasing the frozen Down assets worldwide. Accordingly, they sought and, on August 7, 2000 obtained a TRO from the Circuit Court in Madison County which

barred James Blair Down, Cindy Whitehead-Down, and two others from disposing of or transferring any interests they has in the assets previously frozen in the Canadian Bankruptcy proceeding. (*Id.*)

On August 15, 2000, Interclaim officials left for Madison County to attend a hearing on a motion to convert the TRO to a preliminary injunction. (*Id.* ¶ 29.) Upon arriving at the airport, Interclaim personnel learned that Ness Motley had, without notice or consent from Interclaim, initiated settlement talks with the Down Group and postponed the preliminary injunction hearing. (*Id.* ¶ 30.) Interclaim believes it was at these pre-settlement talks that the Down Group insisted that Interclaim be excluded from any settlement. (*Id.*) Ness Motley did not disclose the nature of this potential conflict to Interclaim, nor did Ness Motley disclose the firm's intention to accept Interclaim's exclusion as a term of any settlement agreement. (*Id.*) Ness Motley nevertheless continued to hold attorney-client meetings with Interclaim, thereby obtaining confidential information based on Interclaim's unique knowledge of the concealed ownership, location, and movement of the Down Groups' assets. (*Id.* ¶ 31.) During these meetings, Interclaim continued to provide Ness Motley with materials regarding the Down Group's lottery sales and money laundering activities, including (a) a chart identifying the financial institutions used by the Down Group, along with known account and transaction information specific to each institution, (b) a table of the Down Group's known assets, (c) a chart tracking the global movement of money, and (d) confidential written work product from a firm of forensic accountants in Canada,

analyzing thousands of documents concerning the ownership and finance of the Down Group's Alberta real estate holdings. (*Id.*)

On August 17, 2000, Ness Motley commenced settlement talks in Chicago with counsel for the Down Group. Representatives from Ness Motley specifically asked Interclaim representatives not to attend the discussions but rather to remain in their hotel. (*Id.* ¶ 32.) At a meeting later that day, Ness Motley representatives informed Interclaim representatives of a proposed settlement with the putative class in which Down would pay $1 million in costs to notify the class of the settlement and establish a fund of approximately $10 million to pay approved class member claims along with Ness Motley's attorneys' fees. Any excess would revert back to Down. (*Id.* ¶ 33.) According to Interclaim, the proposed approval process for the Down victims, who were largely elderly or in declining mental or physical health, was extraordinarily difficult since the victims were unlikely to have retained records of their payments to Down. (*Id.*) Ness Motley reported that the Down Group expected very few claims to be established, with the result that bulk of the fund would revert to Down. (*Id.*) Nevertheless, Ness Motley's attorneys' fees were based on the value of the fund rather than the amount actually paid to class members. (*Id.*)

Interclaim representatives objected to the proposed terms as being grossly unfair to the class and detrimental to Interclaim. (*Id.* ¶ 34.) They noted their access to customer lists reflecting payments by victims in amounts exceeding $100 million. (*Id.*) In light of these records, Interclaim alleges, Down's request that each victim to provide written proof of loss was unreasonably and unnecessary. (*Id.*)

Ness Motley lawyers advised Interclaim that the Down Group had formally demanded, as a precondition to continuing the settlement talks, that Interclaim be excluded from any recovery and barred from any further knowledge of the substantive content of the settlement talks. (*Id.* ¶ 35.) Interclaim objected to this demand, but Ness Motley responded that it would have to protect the class's interest by acceding to the Down Group's conditions. (*Id.*) Ness Motley then continued discussions with the Down Group that afternoon and Interclaim believes settlement discussions have taken place elsewhere since that date. (*Id.* ¶ 36.)

On September 18, 2000, H. Blair Hahn of Ness Motley sent a letter to Martin S. Kenney at Interclaim formalizing the firm's withdrawal from representation of Interclaim, a withdrawal which Interclaim believes took place effectively on August 17 when Ness Motley repudiated its duties to Interclaim during the course of the initial settlement meeting. (*Id.* ¶ 38; Ness Motley Letter Ex. D ("Letter").) Hahn's letter asserted that in the event of a conflict between Interclaim and the class, Ness Motley was obligated to protect the class interest, even at Interclaim's expense. (*Id.* ¶ 38; Letter.) The letter further stated that the proposed settlement, which excluded Interclaim from any settlement discussions and from any recovery, created a conflict of interest precluding Ness Motley from continuing to represent Interclaim, but that Ness Motley would continue to represent the class. (*Id.* ¶ 38; Letter.) Since September 18, 2000, Ness Motley has had no further contact with Interclaim and has not provided Interclaim with any other information regarding the status of settlement talks. (*Id.* ¶ 40.)

On September 29, 2000, Ness Motley agreed to dismiss with prejudice Cindy Whitehead-Down from the Madison County proceeding. (*Id.* ¶ 41.) Interclaim believes this dismissal will affect the preservation of assets subject to the Madison County TRO. Ness Motley informed Interclaim's Vancouver, Canada bankruptcy counsel that this dismissal was conditioned on freezing certain real estate assets, but Interclaim has seen no evidence of any asset freeze. (*Id.*) In fact, Interclaim alleges that six of the twelve remaining frozen commercial assets had been sold as of March 21, 2001 in apparent violation of the Madison County TRO and the asserted consensual freeze of Cindy Whitehead-Down's property. (*Id.*)

On December 4, 2001, Interclaim filed its original complaint against Ness Motley. Its amended complaint, filed on June 22, 2001, has three counts. In Count I, Interclaim alleges that Ness Motley owed it certain fiduciary duties arising from the attorney-client relationship, including the duty of loyalty, honesty, and fidelity in representing Interclaim; the duty to discharge contractual obligations in good faith, the duty to preserve and protect confidential information; and the duty to not use confidential information in ways adverse to Interclaim. (Complaint ¶ 44-46.) Interclaim claims that Ness Motley breached these duties by failing to keep Interclaim informed on all the activities of the class action proceeding, refusing requests to provide copies of motions and pleadings with Canadian counsel, unilaterally withdrawing from representation of Interclaim, agreeing to exclude Interclaim from sharing in any settlement, agreeing to exclude Interclaim from participating in settlement talks, representing a second client in the same litigation after unilaterally dropping Interclaim as its client, revealing confidential

12

information, and agreeing to dismiss a defendant to the detriment of Interclaim and the class. (*Id.* ¶ 47.)

In Count II, Interclaim alleges misappropriation of confidential information. Interclaim conducted an extensive investigation accumulating confidential information provided to Ness Motley pursuant to the Retainer Agreement. (*Id.* ¶ 50.) Interclaim believes Ness Motley has used and continues to use this information in a manner contrary to the interests of Interclaim. (*Id.* ¶ 52.)

Finally, in Count III, Interclaim alleges breach of the Retainer Agreement. Interclaim asserts that Ness Motley has materially breached its obligations under that Agreement by refusing to provide copies to Canadian counsel before filing, by agreeing to negotiate settlement on terms adverse to Interclaim, and by improperly and unilaterally terminating its representation of Interclaim. (*Id.* ¶¶ 55-58.)

## DISCUSSION

Dismissal of a claim under Rule 12(b)(6) is proper only when no relief can be granted under any set of facts that can be proved consistent with the allegations of the complaint. *Harris Trust & Sav. Bank v. E-II Holdings, Inc.*, 926 F.2d 636, 641 (7th Cir. 1991). Written instruments that are attached to and referred to in the complaint may be considered on a motion to dismiss. *See Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir. 1998) (quoting *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994). Both parties here have referred to the specific provisions of the Retainer Agreement in support of their positions.

## Count I: Breach of Fiduciary Duty

In general, in order to successfully assert breach of fiduciary duty, a plaintiff need only plead a fiduciary relationship and its breach. *Young v. Colgate-Palmolive Co.*, 790 F.2d 567, 570 (7th Cir. 1986) (citing RESTATEMENT (SECOND) OF TORTS § 874). Because the parties have not specifically identified what law will apply to this tort claim, the court considers both South Carolina and Illinois law. In South Carolina, an attorney is required to "render services with the degree of skill, care, knowledge, and judgment usually possessed and exercised by members of the profession." *Holy Loch Distribs., Inc. v. Hitchcock*, 340 S.C. 20, 26, 531 S.E.2d 282, 285 (2000). South Carolina recognizes breach of fiduciary duty as a basis for both contract and tort claims. Under a tort theory, plaintiff must establish (1) a duty of care; (2) breach of that duty through act or omission; and (3) resulting injury. *R.J. Hendricks v. Clemson University*, 339 S.C. 552, 562, 529 S.E.2d 293, 298 (S.C.Ct. App. (2000).

In Illinois, "a fiduciary relationship imposes a general duty on the fiduciary to refrain from seeking a selfish benefit during the relationship." *Neade v. Portes*, 193 Ill.2d 433, 440, 737 N.E.2d 496, 500 (2000). As in South Carolina, to successfully plead breach of fiduciary duty in Illinois, the plaintiff must establish (1) existence of a fiduciary duty; (2) breach of that duty; and (3) resulting damages. *Romanek v. Connelly*, 324 Ill. App. 3d 393, 447, 753 N.E.2d 1062, 1072 (1st Dist. 2001).

Ness Motley argues that Interclaim has not sufficiently pleaded a breach of fiduciary duty because the South Carolina Rules of Professional Conduct require

Ness Motley to withdraw from representation of a client when such representation is in conflict with duties owed by another client. *See* South Carolina Rule of Professional Conduct 1.7(a). Ness Motley urges that when the Down Group offered the class a fair settlement in the course of the Madison County class action, the interests of Interclaim directly conflicted with the interests of the class. The offer obligated Ness Motley to present the settlement to the class and pursue it if fair and reasonable. The conflict caused by the settlement talks required Ness Motley to withdraw its representation of Interclaim in furtherance of the Retainer Agreement and under the applicable Rules of Professional Conduct. Ness Motley further argues that Interclaim was not a party to the Madison County class action litigation; as a result, Ness Motley contends, Interclaim's participation in settlement negotiations and proceeds was not required and would have been improper.

Notably, Ness Motley has offered no authority in support of its argument that Interclaim's allegations are insufficient to state a claim for breach of fiduciary duty. Ness Motley's argument disputes the facts set out in the complaint and offers an alternative interpretation of the Agreement. When considering a motion to dismiss, however, the court must accept all of Interclaim's factual allegations as true and draw all reasonable inferences in Interclaim's favor. *Marks v. CDW Computer Ctrs.,* 122 F.3d 363, 367 (7th Cir. 1997), resolving any ambiguity in favor of Interclaim. *Dawson v. General Motors Corp.,* 977 F.2d 369, 372 (7th Cir. 1992).

Under those standards, the court concludes that Interclaim's amended complaint adequately alleges the existence of a fiduciary duty between Interclaim

and Ness Motley. Pursuant to the Retainer Agreement, Ness Motley was acting as "its [Interclaim's] counsel." Interclaim alleges that it disclosed a wealth of information to Ness Motley to enable the firm to initiate class action proceedings in Madison County. (Agreement § D.) The amended complaint also alleges that Interclaim provided additional confidential information to Ness Motley in preparation for settlement talks with the Down Group. (Complaint ¶ 31.)

The amended complaint also describes Ness Motley's alleged breach: as described earlier, Ness Motley agreed to discuss a settlement with the Down Group that prohibited Interclaim from participation or recovery. (*Id.* ¶ 30.) Further, Ness Motley represented a second client in the same litigation after unilaterally dropping Interclaim as a client and used or disclosed Interclaim's confidential information after it withdrew from representing Interclaim. (*Id.* ¶ 37.) Finally, the complaint outlines Ness Motley's decision to dismiss a defendant from the Illinois litigation with prejudice, to the detriment of Interclaim. (Complaint ¶ 41.)

Ness Motley insists that the Rules of Professional Conduct required it to withdraw from representing Interclaim but continue to represent the putative class. As the parties recognize, the Retainer Agreement itself addressed the possibility of a conflict of interest. The relevant provision refers to a conflict of interest over the amount of fees to be paid to Interclaim and directs that, should such a conflict arise, the class should obtain independent counsel to resolve the matter. The court notes that it is not clear that this clause addresses the circumstances presented in Ness Motley's negotiations with the Down Group. Even assuming that Down Group's settlement proposal created a controversy concerning the fees to be paid to

Interclaim, this clause in the Retainer Agreement does not appear to require Ness Motley to sacrifice the interests of Interclaim. Even if Ness Motley is correct that the Rules of Professional Conduct required the firm to withdraw from representing one client in these circumstances, it is not clear to the court why the client who loses representation would have to be Interclaim.

In fact, it might be argued that the Rules of Professional Conduct barred Ness Motley from dropping Interclaim as a client rather than compelling them to do so.[2] Pursuant to the Retainer Agreement, Ness Motley was in effect representing two clients, the class in the action against the Down Group in Madison County and Interclaim in obtaining a judgment against the Down Group for enforcement in Canada. When the Down Group demanded that Interclaim be excluded from any settlement negotiations, Ness Motley could either have rejected that demand as adverse to the interests of Interclaim, or secured Interclaim's consent before proceeding. Ness Motley's failure to take either such action arguably violates Rule 1.7(a) in both Illinois and South Carolina.

Ness Motley's continued representation of the class after unilaterally withdrawing from representing Interclaim may also run afoul of Illinois Rule 1.9(a), which states that a lawyer "who has formerly represented a client in a matter shall not thereafter: (1) represent another person in the same or a substantially related

---

[2]     *See* Illinois Rule of Professional Conduct 1.7(a) stating that "A lawyer shall not represent a client if the representation of the client will be directly adverse to another client, unless (1) the lawyer reasonably believe[s] the representation will not adversely affect the relationship with the other client; and (2) each client consents after disclosure"; South Carolina Rule of Professional Conduct 1.7(a) (spelling out virtually identical requirement).

matter in which that person's interests are materially adverse to the interests of the former client, unless the former client consents after disclosure."[3] The continuing settlement talks with the Down Group on behalf of Ness Motley allegedly prejudiced Interclaim's interests in enforcing a judgment in the Canadian courts, the very reason Interclaim sought out Ness Motley in the first place. The court concludes Plaintiff has alleged a claim for breach of fiduciary duty.

### Count II: Misappropriation of Confidential Information

Ness Motley asserts there are no allegations to justify a conclusion that it revealed confidential information. It points to the language in the agreement that instructs it to "disclose confidential information conveyed to it by Interclaim to a court or courts in the United States in furtherance of the U.S. legal proceedings, as may be reasonably necessary." (Retainer Agreement § 7.0.) Ness Motley argues that the disclosure of the information provided to it by Ness Motley was precisely in furtherance of the class action litigation that Interclaim desired.

In ruling on the motion, the court must interpret the language of the Agreement in the light most favorable to Plaintiff. In that light, the provision cited by Ness Motley does not defeat Plaintiff's claim. The Agreement may be interpreted strictly to require that the confidential information be used only in a court, not in settlement talks. In any event, the Agreement requires that Ness Motley use the information only while Ness Motley represented Interclaim. After Ness Motley terminated this relationship, it was obligated to discontinue any use of

---

[3]     South Carolina Rule 1.9(a) is virtually identical to the Illinois provision.

information it received from Interclaim. *See generally In re Marriage of Decker*, 153 Ill.2d 298, 606 N.E.2d 1094 (1993). The Illinois and South Carolina versions of Rule 1.9 both provide that a lawyer who has formerly represented a client in a matter shall not thereafter use information relating to the representation to the disadvantage of the former client, unless: (a) the use is permitted by Rule 1.6 or (b) the information has become generally known. *See Bobkoski v. Board of Educ. of Cary Cmty. Consol. Sch. Dist., No. 26*, No. 90 C 5737, 1991 WL 61052, at *3 (N.D. Ill. Apr. 12, 1991) (Kocoras, J.).

Taking the allegations in the complaint as true, the information provided to Ness Motley by Interclaim was protected by attorney-client privilege and the rule of confidentiality, was secret and was only to be divulged in a court of law in furtherance of the class action litigation. The complaint also alleges that on information and belief, Ness Motley used this secret information in settlement negotiations with the Down Group after termination of the attorney-client relationship with Interclaim, thereby depriving Interclaim of the benefits of the assembled information. The court is not prepared to conclude that these allegations are insufficient to state a claim for relief. At a minimum, they support a claim of breach of fiduciary duty owed to Interclaim by Ness Motley.[1]

---

[1]    Ness Motley's contention that a claim for breach of confidentiality is preempted by the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*, bears little discussion. The Act precludes common law actions for disclosure of manufacturing methods, customer lists, and the like, but no court has suggested that the Act eviscerates the attorney-client privilege. *See generally Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 651 N.E.2d 209 (1st Dist. 1995). At a status hearing on this motion, Ness Motley's counsel expressed doubt that the information in question
(continued...)

## Count III: Breach of Retainer Agreement

To properly plead a cause of action for breach of contract, a plaintiff must allege (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff. *Gonzalzles v. American Express Credit Corp.*, 315 Ill. App. 3d 199, 206, 733 N.E.2d 345, 351 (1st Dist. 2000). In this case, Interclaim alleges that Ness Motley breached the Retainer Agreement by unilaterally terminating its representation of Interclaim in the class action proceedings. Ness Motley urges that it was not engaged to represent Interclaim in the class action but instead was retained to represent the class of Down Group victims. According to Ness Motley, Interclaim's agreement with certain victims authorized Interclaim to instruct and retain counsel and initiate legal proceedings designed to recover amounts owed to only those victims. Ness Motley argues this is exactly what the firm did: it filed a class action on behalf of class members and is attempting to secure a generous result in the best interests of the class. Ness Motley argues Interclaim's only interest in the Madison County litigation was to see that it proceed, and Ness Motley's able representation of the class constitutes full performance under the agreement and not a breach. Further, as discussed earlier, Ness Motley contends

---

[1](...continued)
is in fact privileged. The court does not share that doubt; the information was furnished by Interclaim to its attorneys in confidence for the purposes of obtaining legal advice. Notably, the Retainer Agreement characterizes this information as privileged. (Agreement § 7.0.) In any event, the allegations support the inference that the information gathered by Interclaim and furnished to Ness Motley in confidence constituted Interclaim's work product.

that applicable rules of professional conduct required the firm to withdraw from representing Interclaim when Interclaim's interests conflicted with the best interests of the class.

In this court's view, the language of the Retainer Agreement contradicts the idea that Interclaim has no role to play in the class action proceedings. The Agreement sets forth Ness Motley's commitment to represent Interclaim itself and the 29 class members as well as Ness Motley's responsibilities with respect to the class action litigation. Interclaim was intricately involved in the suit: the information Interclaim provided allowed Ness Motley to draft the complaint, obtain the TRO, and undertake settlement discussions. Interclaim provided critical assistance to Ness Motley in the litigation until Ness Motley withdrew its representation. Without Interclaim, Ness Motley would be completely unaware of the facts in this case.

Finally, Ness Motley argues that there are insufficient allegations that it breached the Retainer Agreement by failing to provide Interclaim's Canadian counsel with copies of court filings. Ness Motley notes that Interclaim has not alleged which documents were not provided nor explain how it was injured by the alleged breach. To survive a motion to dismiss, Interclaim need only set forth a short and plain statement for its claim for relief. Interclaim is not required to be specific about which filings were involved. Interclaim's assertion that Ness Motley's failure to communicate with the Canadian lawyers prejudiced it are adequate under this standard.

## CONCLUSION

For the reasons set out above, Ness Motley's motion to dismiss (Doc. No. 25-1) is denied.

ENTER:

Dated: October 29, 2001

_____
REBECCA R. PALLMEYER
United States District Judge