AJT/DJD 980.41

Firm I.D. No. 34311

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

INTERCLAIM HOLDINGS LIMITED and )
INTERCLAIM RECOVERY LIMITED, )
                                )
            Plaintiffs, )
                                )
vs.                              )    NO.: 00 C 7620
                                )
NESS, MOTLEY, LOADHOLT, RICHARDSON )
& POOLE, )
                                )
            Defendants. )

JUL 21 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**DOCKETED**

JUL 2 2 2003

<u>**NOTICE OF FILING**</u>

TO:    John R. McCambridge
        Gregory C. Jones
        Laura K. McNally
        GRIPPO & ELDEN
        227 West Monroe Street, Suite 3600
        Chicago, IL 60606

     **PLEASE TAKE NOTICE** that on the 18th day of July, 2003, we have filed with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division Court **DEFENDANT NESS MOTLEY'S MEMORANDUM IN SUPPORT OF ITS' POST-TRIAL MOTION FOR A NEW TRIAL, JUDGMENT AS A MATTER OF LAW AND FOR A REMITTITUR**, a copy of which is attached.

PRICE TUNNEY REITER              Attorneys for Defendant
123 North Wacker Drive, Suite 2220
Chicago, IL 60606
(312) 230-9100

<u>CERTIFICATE OF SERVICE</u>

     I, Monica Vernette Gray, certify under penalties provided by law pursuant to Section 1-109 of the Code of Civil Procedure that I caused the foregoing to be served by hand delivery to each party to whom it is addressed on the 17th day of JULY, 2003.

*Monica Vernette Gray*

105

RECEIVED

JUL 1 8 2003

AJT/DJD 980.41

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

INTERCLAIM HOLDINGS LIMITED and
INTERCLAIM RECOVERY LIMITED,

              Plaintiffs,

vs.

NESS, MOTLEY, LOADHOLT, RICHARDSON
& POOLE,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

FILED

JUL 2 1 2003

NO.: 00 C 7620

JUDGE REBECCA R. PALLMEYER
UNITED STATES DISTRICT COURT

DOCKETED

JUL 2 2 2003

## DEFENDANT NESS MOTLEY'S MEMORANDUM IN SUPPORT OF ITS' POST-TRIAL MOTION FOR A NEW TRIAL, JUDGMENT AS A MATTER OF LAW AND FOR A REMITTITUR

Defendant NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE, by their attorneys,

PRICE, TUNNEY REITER P.C., hereby move pursuant to Federal Rules of Civil Procedure 50 and

59 for a new trial, judgment as a matter of law and remittitur as follows:

### TABLE OF CONTENTS, CASES AND AUTHORITIES

I.    UPON POST-JUDGMENT REVIEW THIS COURT SHOULD SET ASIDE THE PUNITIVE DAMAGE AWARD OF $27 MILLION OR REDUCE IT ON THE GROUND OF EXCESSIVENESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991)
*Pacific Mutual Life Insurance Company v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032 (1991)

II.   THE PUNITIVE DAMAGE AWARD SHOULD BE VACATED BASED UPON THE PLAINTIFF'S FAILURE TO PROPERLY RAISE THE ISSUE IN ITS PLEADINGS. 11

*Hiscott v. Peters*, 324 Ill. App. 3d 114, 257 Ill. Dec. 847, 754 N.E.2d 839 (2nd Dist. 2000)
*Long v. Freisland*, 178 Ill. App. 3d 42, 127 Ill. Dec. 85, 532 N.E. 2d 914 (5th Dist. 1988)
*People v. Connie C.*, 224 Ill. App. 3d 207, 166 Ill. Dec. 540, 586 N.E. 2d 498 (1st Dist. 1991)
*Seibring v. Parcell's Inc.*, 159 Ill. App. 3d 676, 111 Ill. Dec. 278, 512 N.E. 2d 394 (4th Dist. 1987)



III.   THE DISTRICT COURT ERRED IN ITS CHOICE OF LAW ANALYSIS AND THUS THE PUNITIVE DAMAGE AWARD CANNOT STAND . . . . . . . . . . . . . . . . . . . . . . 15

   *Morrow v. L.A. Goldschmidt Associates,* 112 Ill.2d 87, 492 N.E.2d 181 (1986).
   *Hardee v. Penn Mut. Life Ins. Co. of Philadelphia,* 215 SC 1, 53 S.E.2d 861 (1949)
   *Floyd v. County Square Mobile Homes, Inc.,* 287 S.C.51, 336 S.E.2d 502 (1985)
   *Lister v. Nationsbank,* 329 S.C. 133, 494 S.E.2d 449 (1997).
   *Routan v. Pullman Co.,* 183 S.C. 495, 191 S.C. 416 (1937).


IV.   THIS COURT ERRED IN ALLOWING THE ISSUE OF PUNITIVE DAMAGES ON THE BREACH OF FIDUCIARY DUTY COUNT TO GO TO THE JURY WHERE PUNITIVE DAMAGES ARE NOT RECOVERABLE BASED UPON A STATUTORY BAR . . . 19

   *Loitz v. Remington Arms Co.,* 138 Ill. 2d 404, 150 Ill. dec. 510, 563 N.E.2d 397 (1990)
   *Brush v. Gilsdorf,* 335 Ill. AP 3d 356, 270 Ill. Dec. 502, 783 N.E. 2d 77(3rd Dist 2002)
   *McDermott, Will, Emery and Vogel,* 2001 US Dist LEXIS 18916 (N.D. Ill. Nov 9, 2001)
   *Seber v. Unger,* 881 F. Supp. 323 (N.D. Ill.1995)
   735 ILCS 5/2-1115 (West 2002)
   *Bernier v. Burris,* 113 Ill. 2d 219, 497 N.E. 2d 763, 100 Ill. Dec. 585 (1986)
   *Safeway Insurance Company v. Spinak,* 267 Ill. AP 3d 513, 641 N.E. 2d 834, 204 Ill. Dec. 404 (1st District 1994)
   *Lyon v. Hasbro Industries, Inc.* 156 Ill. App. 3d 649, 190 Ill. Dec. 41, 509 N.E. 2d 702 (1987)
   *Owens v. McDermott, Will and Emery,* 316 Ill. AP 3rd 340, 351, 736 N.E. 2nd 145, 249 Ill. Dec. 303 (2000)
   *Black's Law Dictionary,* page 959 (6th Edition, 1990)

   A.   The "Fraud Exception" Raised By the Plaintiffs At Trial Is Inapplicable and Unauthoritative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   *Williams v. Chicago Osteopathic Medical Ctr.,* 173 Ill. App. 3d 125, 122 Ill. Dec. 911, 527 N.E. 2d 409 (1st Dist.1988)
   *Calhoun v. Rane,* 234 Ill. App. 3d 90, 175 Ill. Dec. 304, 599 N.E. 2d 1318 (1st Dist. 1992)
   *Cripe v. Leiter,* at 291 Ill. App. 3d 155, 225 Ill. Dec. 348 (3rd Dist. 1997)
   *Hanumadass v. Coffield, Ungaretti and Harris,* 311 Ill. App. 3d 94, 724 N.E. 2d 14, 243 Ill. Dec. 705 (1st Dist. 2000)


V.   THIS COURT ERRED IN ALLOWING THE BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT COUNT FOR PUNITIVE DAMAGES UNDER SOUTH CAROLINA LAW TO GO TO THE JURY WHERE THERE WAS INSUFFICIENT EVIDENCE TO SEND THAT CAUSE OF ACTION TO THE JURY AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Vann v. Nationwide Insurance Co.*, 257 S.C. 217, 185 S.E. 2nd 363 (1971)

*Holland v. Spartanburg Harald-Journal Co.*, 166 S.C. 454, 165 S.E. 203 (1932).

*Bailey v. North Carolina Life Insurance Co.*, 173 S.C. 131, 175 S.E. 73 (1934)

*Thompson v. Home Security Life Insurance Co.*, 271 S.C. 54, 244, S.E. 2d 533 (1978)

*Branham v. Wilson Motor Co.*, 188 S.C. 1, 198 S.E. 417 (1938)

*Floyd vs. Country Squire Mobile Homes, Inc.*, 287 S.P. 51, 336 S.E. 2nd 502 (1985)

*Welborn vs. Dixon*, 70 S.C. 108, 49 S.E. 232 (1904)

*Klucznik v. Nikitopoulos*, 152 Ill. App. 3d 323, 503 N. E. 2d 1147, 105 Ill. Dec. 141 (2nd Dist. 1987)

*Madigan Bros., Inc., v. Melrose Shopping Center Co.*, 198 Ill. App. 3d 1083, 556 N.E. 2d 730, 145 Ill. Dec. 112 (1st Dist. 1990).

*Farm v. Credit Bank*, 197 Ill. App. 3d at 104.

*Lister v. NationsBank*, 329 S.C. 133, 494 S.E. 2d 449 (1997).

*Doe v. Roe*, 289 Ill. App. 3d 116, 681 N.E. 2d 640, 224 Ill. Dec. 325 (1st Dist. 1997).

VI.     THE PLAINTIFF FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT DEFENDANT'S MISCONDUCT WAS WILLFUL, WANTON OR IN RECKLESS DISREGARD OF PLAINTIFF'S RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Lister v. Nationsbank of Delaware*, N.A., 329 S.C.133, 494 S.E. 2d 449 (1997).

*Hainer v. American Medical Intern*, 328 S.C.128, 492 S.E.2d 103 (1997)

*Taylor v. Medenica*, 324 S.C.200, 479 S.E.2d 35.

*Kuznik v. Bees Fairy Associates, et al.*, 342 S.C.579, 538 S.E.2d 15 (2000).

VII.    THE JURY'S VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE ON THE BREACH OF CONTRACT COUNT AND NESS MOTLEY IS ENTITLED TO A NEW TRIAL OR JUDGMENT AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . .

*Calusinski v. Kruger*, 24 F. 3rd 931 (7th Cir. 1994).

VIII.   THE JURY'S VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE ON THE BREACH OF FIDUCIARY DUTY COUNT AND NESS MOTLEY IS ENTITLED TO A NEW TRIAL OR JUDGMENT AS A MATTER OF LAW . . . . . . . .

*Calusinski v. Kruger*, 24 F. 3rd 931 (7th Cir. 1994).

IX.     THE COMPENSATORY AWARD IN THE AMOUNT OF $8.3 MILLION DOLLARS WAS IMPROPER AND MUST BE VACATED BECAUSE THE "VALUE OF CONFIDENTIAL INFORMATION" WAS AN IMPROPER MEASURE OF DAMAGES AND SUCH DAMAGES WERE NOT PROXIMATELY CAUSED BY ANY CONDUCT OF NESS MOTLEY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Onderisin v. Elgin J. & E. Ry.*, 20 Ill. App. 2d 73, 155 N.E. 2d 338 (2 Dist. 1959)

3

*Alimissis v. Nanos*, 171 Ill. App.3d 1005, 525 N.E.2d 1133 (1st Dist. 1988)
*Sitton v. MacDonald*, 25 S.C. 68
*In re: Estate of Wernick*, 127 Ill.2d 61, 535 N.E.2d 876 (1989)
*Fieldstein v. Guinan*, 148 Ill.App.3d 610 (1st Dist. 1986)
*Doe v. Roe*, 289 Ill.App.3d 116, 681 N.E.2d 640 (1st Dist. 1987)
*Kinzer v. City of Chicago*, 128 Ill.2d 437, 455, 539 N.E.2d 1216 (1989)
*Elson v. State Farm Fire & Casualty Co.*, 295 Ill.App.3d 1, 691 N.E.2d 807 (1st Dist. 1998)
Restatement (Second) of Contracts, Section 349 comment A (1981)
*Chicago Coliseum Club v. Dempsey*, 265 Ill.App. 542 (1932)
*Bruber v. S.M. News Co.*, 126 F. Supp. 442 (S.D.N.Y. 1954)
*Hough v. Jay-Dee Realty Inv.*, 401 S.W.2d 545 (MO App. 1966)
46 Yale L.J. 373-377 (1937)
*O'Conner v. Nolan*, 64 Ill. App. 357
*Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 515 N.E.2d 61 (1987)
*William Ziegler & Son v. Chicago Northwestern Development Co.* 71 Ill.App.3d 276, 389 N.E.2d 195 (2nd Dist. 1979).
Restatement (Second) Section 352.

X.     THIS LEGAL MALPRACTICE ACTION WAS BROUGHT PREMATURELY BECAUSE
       THE UNDERLYING CLASS ACTION CASE IN MADISON COUNTY HAS NOT BEEN
       RESOLVED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Serafin v. Seith*, 284 Ill. App.3d 577, 586-87, 219 Ill. Dec. 794, 672 N.E.2d 302 (1996).
*Glass v. Pitler*, 276 Ill. App.3d 344, 349, 212 Ill. Dec. 730, 657 N.E.2d 1075 (1995).
*Farm Credit Bank v. Gamble*, 197 Ill. App.3d 101, 103, 143 Ill. Dec. 844, 554 N.E.2d 779 (1990)
*Bartholomew v. Crockett*, 131 Ill. App.3d 465, 86 Ill. Dec. 656, 475 N.E.2d 1035 (1985)
*Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App.3d 349, 703 N.E.2d 473 (1998)
*Bronstein v. Kalcheim & Kalcheim*, 90 Ill. App. 3d 957, 959-60, 414 N.E.2d 96 (1st Dist. 1980)
*Boerger v. Levin*, 812 F. Supp. 564 (E.D. Pa. 1993)
*Jones v. Law Firm of Hill and Ponton*, 223 F. Supp. 2d 1284 (M.D. Fla 2002)
*Porter, III v. Ogden, Newell & Welch*, 241 F.3d 1334 (11th Cir. 2001)
*United States National Bank of Oregon v. Davies*, 274 Or. 663 (Or. 1976)
*Dearborn Animal Clinic v. Wilson*, 248 Kan. 257 (Kan. 1991)
*Betty v. Wood*, 204 F.3d 714 (7th Cir. 2000); (*Pal v. Sinclair*, 90 F. Supp. 2d 393 (S.D. N.Y. 2000)
*Igen v. White*, 672 NY Supp. 2d 867 (1998)
*Thompson v. Halvonik*, 36 Call. App. 4th 657 (1995)
*Alhino v. Starr*, 112 Cal. App. 3d 158 (1980)
*Colbert v. Conybeare Law Office*, 239 Mich App. 608 (2000)

XI.   THIS COURT SHOULD DISMISS THIS CAUSE BECAUSE PLAINTIFF, INTERCLAIM
      IS INVOLVED IN CHAMPERTY ........................................

*Berlin v. Nathan*, 64 Ill. App.3d 940, 381 N.E.2d 1367 (1978).
*Oprey, Inc. v Cabana Limited Partnership*, 340 S.C. 367, 532 S.E.2d 269 (2000)

I.  UPON POST-JUDGMENT REVIEW THIS COURT SHOULD SET ASIDE THE
    PUNITIVE DAMAGE AWARD OF $27 MILLION OR REDUCE IT ON THE GROUND
    OF EXCESSIVENESS

In *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991), the Supreme Court of South

Carolina discussed the decision of the United States Supreme Court in *Pacific Mutual Life Insurance*

*Company v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032 (1991). In *Haslip*, the United States Supreme Court

set forth certain guidelines that had been adopted for post-trial review by the Alabama Supreme

Court and held that the application of such standards imposes a sufficiently definite and meaningful

constraint on the discretion of the fact finders in awarding punitive damages.

The South Carolina Supreme Court in *Gamble* adopted that post-judgment test for its State:

> We next address the second aspect of *Haslip*: post-trial procedures for scrutinizing
> awards.
>
> In South Carolina, post-trial relief in the form of motions for judgment
> notwithstanding the verdict, new trial, or new trial *nisi* are available to defendants
> claiming a verdict excessive. *See* S.C.R.C.P. Rules 50 and 59. Moreover, although
> there is no precise formula for measuring a punitive damage award, if the trial judge
> "is convinced that the amount awarded is overliberal, he has the authority and
> corresponding duty to reduce the verdict by order *nisi*." *Hicks v. Herring*, 246 S.C.
> 29, 436, 144 S.E.2d 151, 154 (1965). (Emphasis supplied).
>
> Here, the trial judge, in sustaining the punitive damage award, reduced the actual
> damages by fifty percent. In our view, this reduction of actual damages indicates a
> meaningful and adequate review by the trial court of the damages assessed by the
> jury. We find no infringement of Southern Bell's due process rights.
>
> Hereafter, to ensure that a punitive damages award is proper, the trial court shall
> conduct a post-trial review and may consider the following: (1) defendant's degree
> of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment;
> (4) the existence of similar past conduct: (5) likelihood the award will deter the
> defendant or others from like conduct; (6) whether the award is reasonably related
> to the harm likely to result from such conduct; (7) defendant's ability to pay; and
> finally, (8) as noted in *Haslip*, "other factors" deemed appropriate.

6

Upon completing its review, dedicated to the postulate that no award be grossly disproportionate to the severity of the offense, the trial court shall set forth its findings on the record.

This procedure is applicable in this case to the extent that the punitive damage award is based upon South Carolina law.

The first factor is the degree of defendant's culpability. This factor does not justify a large award because the defendant law firm demonstrated at trial that it had consulted experts in ethical problems before it took the action it did in good faith.

The second factor is the duration of the conduct. This factor is not applicable because the law firm was required to continue to represent the class after it withdrew from its representation of Interclaim.

The third factor is defendant's awareness or concealment. Although plaintiff alleged that defendant law firm had acted secretly, there was little evidence to support any such fact.

The fourth factor is the existence of similar past conduct. There is none.

The fifth factor is the likelihood that the award will deter defendant and others from like conduct. This is not applicable because this situation is very unique.

The sixth factor is whether the award is reasonably related to the harm likely to result from such conduct. This factor is especially applicable here where the award of $27 million is far greater than the harm done.

The seventh factor is the defendant's ability to pay. This has been shown by the evidence in the record.

7

The eighth factor is "other factors" deemed appropriate. The Court should consider Interclaim's business model to be contrary to public policy because it is champertous and unconscionable.

Upon this review, it is clear that the punitive award is grossly disproportionate to the severity of the offense. This Court should make such a finding upon review and set aside or reduce the punitive verdict.

The United States Supreme Court again expressed its concern with large awards of punitive damages in *State Farm Automobile Insurance Company v. Campbell*, 123 S.Ct. 1513 (2003). There the Court stated that a punitive damage award of $145 million on a $1 million compensatory verdict violated due process. The Court stated that exacting appellate review ensures that an award of punitive damages is based upon an application of law rather than a decision maker's caprice.

The Court requires that courts reviewing punitive damages awards are to consider three guideposts:

(1)   The degree of reprehensibility of the defendant's misconduct;

(2)   The disparity between the actual harm suffered by plaintiff and the punitive damage award; and

(3)   The difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in similar cases.

These factors overlap those discussed above in *Gamble*, but they nevertheless are another indication that this punitive award of $27 million is extremely excessive.

The Supreme Court of the United States elaborated on these three factors as follows:

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore, supra*, at 575, 116 S.Ct. 1589. We have instructed courts to determine the reprehensibility of a

8

defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. 517 U.S., at 576-577, 116 S.Ct. 1589. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damage award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. *Id.*, at 575, 116 S.Ct. 1589.

As shown above, the degree of reprehensibility in the conduct of defendant Ness Motley was not great. The defendant sought and acted upon an ethics expert's professional opinion in doing what it did. It was an isolated incident. The harm was economic and did not cause physical harm and did not show any reckless disregard of the safety of others. There was no malice involved in the conduct.

Thus, the first factor does not support the punitive award.

The Court then discussed the second factor:

> Turning to the second *Gore* guidepost, we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. *Gore, supra*, at 582, 116 S.Ct. 1589 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award"); *TXO, supra*, at 458, 113 S.Ct. 2711. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In *Haslip*, in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. **499 U.S., at 23-24, 111 S.Ct. 1032.** We cited that 4-to-1

9

ratio again in *Gore*, 517 U.S., at 581, 116 S.Ct. 1589. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. *Id.*, at 581, and n. 33, 116 S.Ct. 1589. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, *Id.*, at 582, 116 S.Ct. 1589, or, in this case, of 145 to 1.

In this case, the punitive damage award was more than three times the compensatory award of $8.3 million. Thus, it is close to the line of constitutional impropriety. It should therefore be set aside or reduced.

The Supreme Court then discussed the third factor:

The third guidepost in *Gore* is the disparity between the punitive damages award and the "civil penalties authorized or imposed in comparable cases." *Id.*, at 575, 116 S.Ct. 1589. We note that, in the past, we have also looked to criminal penalties that could be imposed. *Id.*, at 583, 116 S.Ct. 1589; *Haslip*, **499 U.S., at 23, 111 S.Ct. 1032.** The existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award.

This factor shows the impropriety of the award. There is no criminal penalty for following an expert's advice in a conflict decision. There is no civil penalty in this case and no professional penalty.

Therefore, according to all of the tests set forth by the United States Supreme Court, this verdict is excessive and must be reduced.

10

II.   THE PUNITIVE DAMAGE AWARD SHOULD BE VACATED BASED UPON THE
      PLAINTIFF'S FAILURE TO PROPERLY RAISE THE ISSUE IN ITS PLEADINGS.

        Plaintiffs proceeded to trial on this case on an Amended Complaint that was filed in three

Counts.  Count I of the Amended Complaint alleged breach of fiduciary duty; Count II of the

Amended Complaint pleaded misappropriation of confidential information; and Count III of the

Amended Complaint pleaded breach of the Retainer Agreement.  No where in the Amended

Complaint did Plaintiffs plead a Count alleging wilful and wanton conduct, fraudulent conduct, a

fraudulent act, or a claim based on careless and reckless disregard of duty.

        The relief sought by Plaintiffs in their Amended Complaint, in each of the three Counts was

for a sum of money in excess of $75,000.00.  No where in Plaintiff's Amended Complaint was there

a prayer for relief for punitive or exemplary damages.

        The Defendant timely answered the Amended Complaint.

        In October of 2002 the Plaintiff served the Defendant with Supplemental Interrogatories,

included within those Interrogatories at numbers 2, 3, 4, 5, and 6 were questions seeking information

regarding state and federal tax returns filed by the Defendant; documents sufficient to establish the

gross revenues and expenses of the Defendant; financial statements of the Defendant; cash flow

statements of the Defendant; and, documents sufficient to establish the net worth of Defendant.  With

regard to Interrogatories 2 through 6 the Defendant filed an objection based on relevance and stating

that the financial condition of the Defendant was not an issue in the case.

        In response to the Defendant's answers to Interrogatories seeking financial information, the

Plaintiffs took no action, whatsoever, until February of 2003 when counsel for Plaintiff wrote to

11

counsel for Defendant requesting compliance with the items to which Defendant had previously objected.

After discussions, Defendant refused to produce such documents based on the fact that the documents were not discoverable since no claim for punitive damages had been pled.

On February 25, the parties appeared in Court before Judge Pallmeyer on Plaintiff's Motion to Compel Financial Discovery. The matter was continued for hearing to March 14, 2003.

At the hearing, Plaintiff's counsel indicated to the Court his intention to seek punitive damages at the trial of the cause, and defense counsel objected to the production of the requested documents on the basis that there had been no issue of punitive damages made out by the pleadings, and Defendant's counsel had made a full disclosure of all other relevant documents prior to that date. The Court, on that date, ordered the Defendant to produce the documents sought by Interrogatories 2 through 6, and advised the parties to agree on a Protective Order. The Court noted that in the event that the subject of punitive damages ever became an issue at trial, it would be better to have the discovery completed in advance than to have to recommence discovery at that point in time. The Court made no determination as to whether the subject of punitive damages was ripe as of the hearing date of March 14, 2003.

Thereafter, pursuant to the Protective Order, entered into between the parties, Defendant produced the documents sought by Interrogatories 2 through 6.

At the final pre-trial conference of this case on May 7, 2003, the Defendants presented a Motion to Bar the Introduction of Evidence on the financial condition of the Defendant, Ness Motley, on the basis that there was no allegation in the Complaint to support a claim for punitive damages; there was no prayer for relief seeking punitive damages; and, Defendant argued, that unless

12

and until there was a motion from Plaintiff to the Court seeking punitive damages, that the Court should not allow the introduction of any evidence or comment regarding the net worth of the Defendant during the trial. The Court granted that motion in part and stated that it would bifurcate the punitive damages issue and stated that at the time that issue became ripe, the Court would then conduct a hearing, hear arguments of counsel and determine whether or not to instruct the jury on punitive damages.

At the conclusion of the trial and prior to the jury returning a verdict on the compensatory damage issue, the Court held a brief hearing on Wednesday, July 2, 2003 with respect to the question of punitive damages. Various proposals for instructions were placed before the Court and as had been contemplated at the pre-trial conference on May 7, 2003, Plaintiff and Defendant submitted its proposals for instructions and made its arguments for and in opposition to instructing the jury on the question of punitive damages.

The Court suggested that the parties continue to work on those issues over the evening and return to Court the following morning at approximately 10:30 a.m. for further hearings with regard to the question of punitive damages.

During that intervening period, at the direction of the Court, Defendant submitted to Plaintiffs its arguments in opposition to the Court instructing the jury on punitive damages and its comments with regard to specific punitive damage instructions.

Counsel for the Defendant also provided the Court, via email, with its comments and arguments in opposition to the Court's consideration of instructing the jury on punitive damages and its comments with respect to the instructions.

13

At approximately 10:30 a.m. on July 3, 2003, the Court conducted a further hearing with regard to the question of punitive damages and the parties presented their arguments, by Plaintiff in favor of instructing the jury on punitive damages, and by the Defendant in opposition to instructing the jury on punitive damages, in general, and specifically in opposition to instructing the jury on punitive damages as to the breach of fiduciary duty issue, which Defendant argued was barred by Illinois law.

At the conclusion of that hearing, the Court determined that it would instruct the jury on punitive damages in the event that the jury returned a compensatory finding in favor of Plaintiff.

After the jury returned its verdict into Court, and awarded $8.3 Million in compensatory damages to the Plaintiff, the Court permitted counsel for Plaintiff and counsel to Defendant to offer brief arguments to the jury in favor of and in opposition to the award of punitive damages, and thereafter, instructed the jury on the punitive count.

After a 30 minute deliberation, the jury then returned into Court a verdict awarding punitive damages in the sum of $27.7 Million in favor of Plaintiff.

Based upon the aforementioned, this Defendant asks that the punitive damage award be vacated based upon the failure of the plaintiff to timely raise the issue in its pleadings. Such failure greatly prejudiced this Defendant. See, *Hiscott v. Peters*, 324 Ill. App. 3d 114, 257 Ill. Dec. 847, 754 N.E. 2d 839 (2nd Dist. 2000) (holding that amendment after judgment was improper and prejudicial); *Long v. Freisland*, 178 Ill. App. 3d 42, 127 Ill. Dec. 85, 532 N.E. 2d 914 (5th Dist. 1988) (holding that it is impermissible to add a new action after judgment); *People v. Connie C.*, 224 Ill. App. 3d 207, 166 Ill. Dec. 540, 586 N.E. 2d 498 (1st Dist. 1991)(holding that amendment of pleadings improper where the nature of the proof required to defend is altered); *Seibring v. Parcell's Inc.*, 159

14

Ill. App. 3d 676, 111 Ill. Dec. 278, 512 N.E. 2d 394 (4th Dist. 1987) (holding that amendment improper where party seeking to amend had knowledge of the new matters when the original complaint was filed).

III.    THE DISTRICT COURT ERRED IN ITS CHOICE OF LAW ANALYSIS AND THUS THE PUNITIVE DAMAGE AWARD CANNOT STAND.

The action brought by Interclaim sought punitive damages for the alleged beach of contract. The very first step in the trial of this cause was the determination of the appropriate law to be applied to the various issues raised.

It is elementary law in Illinois that punitive damages are not allowed in breach of contract cases. The sole purpose of contract damages is to compensate the non-breaching party. Punitive damages are not even available for willful breach of contract. *Morrow v. L.A. Goldschmidt Associates*, 112 Ill.2d 87, 492 N.E.2d 181 (1986).

Thus, Plaintiff herein could only recover punitive damages for a breach of contract as provided for by the South Carolina law, including its choice law doctrine.

The law in South Carolina regarding the recovery of punitive damages for a breach of contract is clear. In *Hardee v. Penn Mut. Life Ins. Co. of Philadelphia,* 215 SC 1, 53 S.E.2d 861 (1949), the Supreme Court of South Carolina stated as follows:

> In the recently decided case of *Smyth v. Fleischmann*, 214 S.C. 263, 52 S.E.2d 199, 203, this Court had occasion to state that in long line of cases beginning with *Welborn v. Dixon*, 70 S.C. 108, 49 S.E.232, 3 Ann.Cas. 407, *** it has been consistently held that where the complaint states a cause of action for breach of contract, allegations charging the defendant with a fraudulent intent or purpose in breaching the contract do not give rise to a right to recovery punitive damages; that such damages are recoverable only where, in addition to or independently of the fraudulent intent that brought about the breach three was some fraudulent act on the part of the defendant *accompanying the breach.* Even in the willful and fraudulent

15

breach of a contract only actual damages may be recovered, unless the fraudulent breach is accompanied by a fraudulent act.

It is an absolute necessity to allege and prove a fraudulent breach of contract accompanied

by a fraudulent act.

The three elements that must be proven were set forth in *Floyd v. County Square Mobile Homes, Inc.*, 287 S.C.51, 336 S.E.2d 502 (1985) as follows:

> Our law has long recognized a plaintiff's right to recover punitive damages for breach of contract accompanied by a fraudulent act. See *Welborn v. Dixon*, 70 S.C. 108, 49 S.E. 232 (1904). However, mere breach of contract, even if willful or with fraudulent purpose, is not sufficient to entitle a plaintiff to go to the jury on the issue of punitive damages. *Vann v. Nationwide Ins. Co.*, 257 S.C. 217, 185 S.E.2d 363 (1971); *Holland v. Spartanburg Herald-Journal Co.*, 166 S.C. 454, 165 S.C. 203 (193). To recover punitive damages for breach of contract accompanied by a fraudulent act, the plaintiff must prove three elements:
>
> (1)     *A breach of contract. Bailey v. North Carolina Mutual Life Ins. Co.*, 173 S.C. 131, 175 S.C. 73 (1934). In the *54 absence of a breach of contract, the plaintiff's proper cause of action will generally be for fraud in the inducement. See *Smyth v. Fleischmann*, 214 S.C. 263, 52 S.E.2d 199 (1949).
>
> (2)     *Fraudulent intent relating to the breaching of the contract and not merely to its making. Thompson v. Home Security Life Ins. Co.*, 271 S.C. 54, 244 S.E.2d 533 (1978); *Branham v. Wilson Motor Co.*, 188 S.C. 1, 198 S.E. 417 (1938). Fraudulent intent is normally **504 proved by circumstances surrounding the breach. See *Sutton v. Continental Casualty Co.*, 168 S.C. 372, 167 (1933).
>
> (3)     A *fraudulent act accompanying the breach. Vann v. Nationwide Ins. Co., supra; Hardee v. Penn Mutual Life Ins. Co.*, 215 S.C. 1, 53 S.E.2d 861 (1949). The fraudulent act may be prior to, contemporaneous with, or subsequent to the breach of contract, but it must be connected with the breach itself and cannot be too remote in either time or character. See *Smith v. Canal Ins. Co.*, 275 S.C. 256, 269 S.E.2d 348 (1980); *Wright v. Public Savings Life Ins. Co.*, 262 S.C. 285, 204 S.E.2d 57 (1974); *Davis v. Bankers Life & Casualty Co.*, 227 S.C. 587, 88 S.E.2d 658 (1955); *Porter v. Mullins*, 198 S.C. 325, 17 S.E.2d 684; *Bradley v. Metropolitan Life Ins. Co.*, 162 S.C. 303, 160, S.E. 171 (1931).

16

The third element of a fraudulent act accompanying the breach is the critical item in this analysis.

It was absolutely necessary to determine the choice of law issues in this case before it could proceed because the contract was entered into in South Carolina, yet the breach and damage occurred in Illinois.

The South Carolina Court of Appeals has shown how this determination must be made in *Lister v. Nationsbank*, 329 S.C. 133, 494 S.E.2d 449 (1997). The Appellate Court stated in part:

> Before determining choice of law, this Court must first decide if the cause of action for breach of contract accompanied by a fraudulent act is an action in contract or in tort. In *Peeples v. Orkin Exterminating Co.*, 244 S.C. 173, 135 S.E.2d 845 (1964), the theory of breach of contract accompanied by a fraudulent act is identified as an action in contract:

> An action for breach of contract accompanied by a fraudulent act is an action *ex contractu*, not *ex delicto*, *Cain v. United Insurance Company of America*, 232 S.C. 397, 102 S.E.2d 743; however, it partakes of elements of both contract and tort.

> Peeples, 244 S.C. at 178, 135 S.E.2d at 847. South Carolina has long recognized a plaintiff's right to recover punitive damages for breach of contract accompanied by a fraudulent act. *Floyd v. Country Squire Mobile Homes, Inc.*, 287 S.C. 51, 336 S.E.2d 502 (Ct. App. 1985). However, mere breach of a contract, even if willful or with fraudulent purpose, is not sufficient to entitle a plaintiff to go to the jury on the issue o punitive damages. Id. See also *Vann v. Nationwide Ins. Co.*, 257 S.C. 217, 220, 185 S.E.2d 363, 364 (1971). ("Even in the willful and fraudulent breach of a contract only actual damages may be recovered, unless the fraudulent breach is accompanied by a fraudulent act"). It is the accompanying fraudulent act that allows recovery for punitive damages.

The Court noted that the element of the accompanying fraudulent act is a tort and therefore the choice of law standards relative to torts must be applied to it.

> Elementally the tort prong of breach of contract accompanied by a fraudulent act is "accompanied by a fraudulent act". Absent a "fraudulent act accompanying the breach", there can be no recovery for punitive damages. Because the element that gives rise to punitive damages, which is the issue in question, is the tortuous element of breach of contract accompanied by a fraudulent act, we will first analyze this case under the choice of law test for torts.

17

A. Tort Standard

[4][5] Under traditional South Carolina choice of law principles, the substantive law governing a tort action is determined by the state in which the injury occurred. *Bannister v. Hertz Corp.*, 316 S.C. 513, 450 S.E.2d 629 (Ct. App. 1994). See also *Dawkins v. State*, 306 S.C. 391, 412 S.E.2d 407 (1991) (it is well established in South Carolina that in tort cases law of place where injury was occasioned or inflicted, governs in respect of right of action, and law of forum in respect to matters pertaining to remedy only); **455 *Oshik v. Osheik*, 244 S.C. 249, 136 S.E.2d 303 (1964) (generally, where action is brought in one jurisdiction for tort committed in another, all matters relating to right of action are governed by law of place of tort); *Rauton v. Pullman Co.*, 183 S.C. 495, 501, 191 S.E. 416, 419 (1937) (the well-established rule is "the law of the place where the injury was occasioned or inflicted, governs the respect of the right of action, and the law of the forum in respect to matters pertaining to the remedy only.").

Accordingly, it is clear that the law of Illinois applies with respect to the tort aspect of the accompanying act. The *Lister* Court held that the place of the plaintiff's loss applies under the choice of law test for torts. The Court noted that it had not adopted the modern choice of law test found in the Restatement, but stated that the result would be the same.

The provision of the contract between the parties that the law of South Carolina will be applied relates only to the interpretation of the contract itself. The fraudulent act accompanies a breach of the contract and so the choice of law as to that tort is not governed by the provision of the contract.

Thus it is clear that the law of Illinois with respect to the tort aspect of the case applies. As noted above, punitive damages are not permitted in Illinois and so plaintiff, Interclaim cannot recover punitive damages in this case.

The Supreme Court of South Carolina has so stated in *Routan v. Pullman Co.*, 183 S.C. 495, 191 S.C. 416 (1937).

18

With reference to torts, the well-established rule is that the law of the place where the injury was occasioned or inflicted, governs in respect of the right of action, and the law of the forum in respect to matters pertaining to the remedy only. *Northern Pac. R. Co. v. Babcock*, 154 U.S. 190, 14 S.Ct. 978, 38 L.Ed. 958; *Evey v. Mexican Cent. R. Co. (C.C.A.)*, 81 F. 294, 38 L.R.A. 387.

In this country the *lex loci* controls, even though under the *lex fori* a different result to tort liability would arise from the facts relied on. *Slater v. Mexican Nat. R. Co.*, 194 U.S. 120, 24 S.Ct. 581, 584, 48 L.Ed. 900; *Northern Pac. R.Co. v. Babcock, supra; Huntington v. Attrill*, 146 U.S. 657, 13 S.Ct. 224, 36, L.Ed. 1123.
The rule that if the law of the state or jurisdiction where the wrong is committed, when applied to the case, does not give a right of action against the wrongdoer, then no action can be sustained, is to well established that we may dismiss the question without further consideration.

Upon the question of whether the measure of the damages for a tort, committed in one state and sued on in another, is determinable by the law of the forum or by the law of the place where the tort was committed, the great weight of authority supports the doctrine that the *lex loci delecti* controls. The measure of damages is regarded as pertaining to the substantive, rather than to the mere remedial, rights of the injured person. *Western Union Tel. Co. v. Brown*, 234 U.S. 542, 34 S.Ct. 955, 58 L.Ed. 1457; *Slater v. Mexican Nat. R. Co., supra; Northern Pac. R. Co. v. Babcock, Supra*. Also see the numerous supporting cases cited in the note under section 29, 62 C.J. 1114, and monographic note on the subject in 91 Am. St. Rep. 714.

It necessarily follows that if the fraudulent act accompanying the fraudulent breach of contract is governed by Illinois law and no punitive damages are allowed in Illinois for a separate fraudulent act accompanying a breach of contract. The District Court erred in instructing the jury on South Carolina law with respect to this issue.

The punitive damage award must therefore be vacated.

The principles of the above cited cases govern in this trial. It is clear that the $27 million punitive damage awarded in favor of the plaintiff, Interclaim, must be vacated on post judgment motion. No such recovery is allowed under well-settled law.

IV.    VIII. THIS COURT ERRED IN ALLOWING THE ISSUE OF PUNITIVE DAMAGES ON THE BREACH OF FIDUCIARY DUTY COUNT TO GO TO THE JURY WHERE

19

PUNITIVE DAMAGES ARE NOT RECOVERABLE BASED UPON A STATUTORY BAR.

This Court applied Illinois law to the breach of fiduciary duty count. Punitive damages may not be recovered in cases of medical or legal malpractice in Illinois. *Loitz v. Remington Arms Co.,* 138 Ill. 2d 404, 150 Ill. dec. 510, 563 N.E. 2d 397 (1990); *Brush v. Gilsdorf,* 335 Ill. AP 3d 356, 270 Ill. Dec. 502, 783 N.E. 2d 77(3rd Dist 2002) (holding that clients' prayer for punitive damages against its attorneys for breach of fiduciary duty was properly stricken where the gravamen of the complaint was legal malpractice); *McDermott, Will, Emery and Vogel,* 2001 US Dist LEXIS 18916 (N.D. Ill. Nov 9, 2001) (holding Section 2-1115 barred punitive damages on counterclaim by Defendant against the Plaintiff law firm for legal malpractice and breach of contract based on professional misconduct); *Seber v. Unger,* 881 F. Supp. 323 (N.D. Ill.1995)(holding punitive damages are not available in Illinois for legal malpractice claims and that Plaintiff could not circumvent this statutory bar by recasting his claim as one for fraud or willful and wanton conduct; the court held that where the alleged fraud arises from the provision of legal services or where the willful and wanton conduct is related to the acts of professional malpractice, punitive damages are unavailable).

735 ILCS 5/2-1115 of the Illinois Code of Civil Procedure entitled "Punitive Damages Not Recoverable in Healing Art and Legal Malpractice Cases," states as follows:

> SEC. 2-1115. Punitive damages not recoverable in healing art and legal malpractice cases. In all cases, whether in tort, contract or otherwise, in which the Plaintiff seeks damages by reason of legal, medical, hospital, or other healing art malpractice, no punitive, exemplary vindictive or aggravated damages shall be allowed.

The Illinois Supreme Court has upheld Section 2-115 as a constitutional expression of a

20

legitimate legislative goal, concluding that it did not violate equal protection and due process guarantees, the Illinois Constitution's single - subject clause, or the ban of special legislation. *Bernier v. Burris,* 113 Ill. 2d 219, 497 N.E. 2d 763, 100 Ill. dec. 585 (1986). In so doing, our Supreme Court recognized that the legislature had enacted the statute intending to limit the imposition of excessive liability and undue burdens on providers of professional services such as this defendant. *Bernier,* 113 Ill. 2d at 246.

Section 2-115 of the Code is extremely broad and has been interpreted to encompass "any acts arising out of the provision of legal services". *Safeway Insurance Company v. Spinak,* 267 Ill. AP 3d 513, 641 N.E. 2d 834, 204 Ill. Dec. 404 (1st District 1994); see also *Brush v. Gilsdorf, et al.,* 335 Ill. AP 3d 356, 783 N.E. 2d 77, 270 Ill. Dec. 502 (3rd Dist 2002). Thus, the courts have looked to the nature of the behavior alleged in a Plaintiff's complaint to determine whether the activities alleged fall within the term legal malpractice. *Safeway,* 267 Ill. App. 3d at 517; see also *Lyon v. Hasbro Industries, Inc.* 156 Ill. App. 3d 649, 190 Ill. Dec. 41, 509 N.E. 2d 702 (1987); *Owens v. McDermott, Will and Emery,* 316 Ill. AP 3rd 340, 351, 736 N.E. 2nd 145, 249 Ill. Dec. 303 (2000) (holding that the availability of punitive damages depends on whether a Plaintiffs' allegations as to the defendants conduct falls within "the rubric of [legal] malpractice.") Therefore, in determining the applicability of Section 2-1115, a court must look to "the nature of behavior alleged" in the Plaintiffs' complaint to "determine whether the activities fall within the term "legal malpractice" *Safeway Insurance Co.,* 267 Ill. AP 3rd at 518; see also, *Brush,* 335 Ill. AP 3rd at 360.

In the case *sub judice*, the acts and omissions which are the subject of the Plaintiff's complaint all arose from the provision of legal services and the rubric of legal malpractice. According to Black's Law Dictionary, Legal Malpractice consists of the "failure of an attorney to use

21

such skill, prudence and diligence of lawyers of ordinary skill and capacity commonly possess an exercise in performance of tasks which they undertake." *Black's Law Dictionary,* page 959 (6th Edition, 1990). Here, the Plaintiff, Interclaim alleges in its complaint that it was injured as a result of certain acts of misconduct arising out of and directly attributable to its attorney client relationship with Interclaim. For example, it is undisputed that Interclaim and Ness Motley signed a Retainer Agreement and that an attorney-client relationship arose as a result of that agreement. Here, the Plaintiff Interclaim alleges that the Defendant, Ness Motley breached the Retainer Agreement by failing to prosecute to final end a Class Action Lawsuit on behalf of a class of victims of Blair Down which included the 29 co-petitioners. Interclaim further alleged that Ness Motley breached its fiduciary duties arising from the attorney client relationship during and after the course of that representation. Thus, all of the acts which the Plaintiff alleges caused it damage arose directly from the provision of legal services.

It is well settled that Section 2-1115 of the Code broadly encompasses acts arising out of the provision of legal services such as those here at issue. *Safeway Insurance Co.,* 267 Ill. AP 3rd at 517. Therefore, because the alleged injury to Interclaim was suffered by reason of Ness Motley's professional conduct arising from legal representation, the gravamen of the claim is clearly legal malpractice. Certainly, all of the injury and acts alleged by the Plaintiff arise directly out of the provision of legal services by Ness Motley and this action falls squarely within the broad language of the statute. *Id.*

Additionally, this court on numerous occasions referred to this case as a malpractice action with no objection by the Plaintiff. For example, at the pre-trial hearing on May 7, 2003 on page 14 of the transcript, the court stated as follows:

THE COURT: The reason why I'm asking these questions, as I am sure you are aware, in legal malpractice actions there is this doctrine of ripeness. You have to show you are actually damaged. In other words, you have to have lost the underlying litigation in order for there to be a live claim but Interclaim could not have been part of this lawsuit. That's the Defendant's position?

MR. TUNNEY: Interclaim was never part of that lawsuit. They were never a named party in the litigation.

THE COURT: Is that part of what they claimed was the malpractice here?

MR. TUNNEY: No.

Here the Court, as it did on numerous other occasions, characterized this as a case of legal malpractice without any objection by the Plaintiff. This characterization of malpractice is wholly proper in that all of the allegations made by the Plaintiff Interclaim arise from the furnishing of legal services.

Despite the Defendant's citation to the aforementioned statute and other supporting authority prior to the jury instruction conference on punitive damages, at the July 3, 2003 conference on the punitive damages jury instructions this court stated as follows:

I have looked at the case law, and it really seems to me that the statute appears to provide that you cannot recover punitive damages in a claim of legal malpractice.
There exceptions when you can characterize the conduct of a lawyer in some fashion other than legal malpractice; for example, fraud. In this case, I think the Plaintiff's are going to argue that we can say that a breach of fiduciary duty is something different from legal malpractice. My sense is it really is akin to legal malpractice.

That aside, I think under the procedural status we are right now it makes sense for us to proceed with the plan that we had because I will certainly have 10 days in which to consider any motion that's filed and potentially strike any award that's made for punitive damages on the ground it's not authorized under Illinois law.

Over the objections of this Defendant and after further citation to the statute and supporting

23

authority, this court decided to instruct the jury on the breach of fiduciary duty count improperly

seeking punitive damages under Illinois law despite clear precedent to the contrary. It was a clearly

stated intention of this court that it could correct any error as to such a bar in post trial motions.

However, the verdict form did not distinguish between the breach of fiduciary count under Illinois

Law and the count made under South Carolina Law for breach of contract with a fraudulent act. As

a result, one cannot identify the basis for the jury's decision to award punitive damages and the

entire punitive damage award must be stricken on this basis alone.

A.    The "Fraud Exception" Raised By the Plaintiffs At Trial Is Inapplicable and
      Unauthoritative

While it is well settled that Section 2-1115 of the Code bars punitive damages arising out of

the provision of legal services, there is a split among the circuits of the Illinois Appellate Courts only

as to the issue of whether this section prohibits punitive damages *where a Plaintiff alleges Common

Law Fraud*.   Here, the Plaintiff never alleges common law fraud or any other type of fraud.

For example, in the case *Williams v. Chicago Osteopathic Medical Ctr.*, 173 Ill. App. 3d 125,

122 Ill. Dec. 911, 527 N.E. 2d 409 (1st Dist.1988), the First District Appellate Court held that

Section 2-1115 prohibited punitive damages for a claim of an intentional fraud action arising from

the provision of medical services, where a physician intentionally misinformed parents as to the

death of their newborn child and prevented that child from receiving prompt care. A look at the

analysis in *Williams* is instructive. The *Williams* court asks whether the allegations of intentional

fraud "arise from the provision of medical services." The court states that if they do, they are clearly

within Section 2-1115 and punitive damages are barred. *Lyon v. Hasbro Industries, Inc.*, 156 Ill.

App. 3d 649, 655, 509 N.E. 2d 702, 706 (1987).

24

Similarly, the case of *Calhoun v. Rane*, 234 Ill. App. 3d 90, 175 Ill. Dec. 304, 599 N.E. 2d 1318 (1st Dist. 1992), held that Section 2-1115 prohibited punitive damages in legal malpractice cases including intentional fraud arising from the provision of legal services. Therefore, the First District Appellate Court has clearly held that *even in cases of intentional fraud*, <u>which was not plead in the case at bar</u>, Section 2-1115 acts as a complete bar to the recovery of punitive or exemplary damages in cases arising from legal services. *Id.*

However, the Third District Appellate Court in the case of *Cripe v. Leiter*, at 291 Ill. App. 3d 155, 225 Ill. Dec. 348 (3rd Dist. 1997), held that Section 2-1115 does not prohibit punitive damages where a Plaintiff alleged that an attorney committed Common Law Fraud by falsifying billings. In the case of *sub judice,* Interclaim has not alleged fraud of any kind and thus any citation to *Cripe* is inapplicable. Furthermore, even if one is to somehow ignore the clear rulings of the 1st District, as Interclaim will no doubt argue, *Cripe* is totally inapplicable in the case of *sub judice* because *the action at bar is not fraud*, but breach of fiduciary duty.

In dealing with this very issue and the *Cripe* case specifically, the Third District in the case of *Brush v. Gilsdorf*, 355 Ill. App. 3d 356, 783 N.E. 2d 77, 270 Ill. Dec. 502 (3rd Dist. 2002), wrote as follows:

> In *Cripe v. Leiter,* [citation omitted], the Defendant attorney falsified bills with regard to the number of hours that were spent on the client's case. The court reasoned that although Section 2-1115 precludes punitive awards in legal malpractice suits, legal malpractice and common law fraud are separate and distinct actions; therefore, punitive damages can be awarded in fraud cases. *Cripe,* 291 Ill. AP 3rd at 159. Our decision in *Cripe* is not dispositive of the present case because we deal not with fraud, but with fiduciary duty.

Claims grounded in breach of contract and breach of fiduciary duty are included within the

rubric of legal malpractice. *Hanumadass v. Coffield, Ungaretti and Harris,* 311 Ill. App. 3rd 94, 724 N.E. 2nd 14, 243 Ill. dec. 705 (1st Dist. 2000). Thus, *Cripe* is totally inapplicable.

For the reasons stated above, this court should vacate the judgment as to the punitive damages in its entirety on the grounds of a mistake of law.

V.    THIS COURT ERRED IN ALLOWING THE BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT COUNT FOR PUNITIVE DAMAGES UNDER SOUTH CAROLINA LAW TO GO TO THE JURY WHERE THERE WAS INSUFFICIENT EVIDENCE TO SEND THAT CAUSE OF ACTION TO THE JURY AS A MATTER OF LAW.

This Court applied South Carolina law to the issue of breach of contract. Although South Carolina Law allows a Plaintiff to recover punitive damages for breach of contract when it is accompanied by a fraudulent act, the breach of a contract, even if willful or with fraudulent purpose, is not sufficient to entitle a Plaintiff to go to the jury on the issue of punitive damages. *Vann v. Nationwide Insurance Co.,* 257 S.C. 217, 185 S.E. 2nd 363 (1971); *Holland v. Spartanburg Harald-Journal Co.,* 166 S.C. 454, 165 S.E. 203 (1932). In order to recover punitive damages for breach of contract accompanied by a fraudulent act, the Plaintiff must prove three elements: (1) breach of a contract. *Bailey v. North Carolina Life Insurance Co.,* 173 S.C. 131, 175 S.E. 73 (1934); (2) fraudulent intent relating to the breaching of the contract and not merely to its making. *Thompson v. Home Security Life Insurance Co.,* 271 S.C. 54, 244, S.E. 2d 533 (1978); *Branham v. Wilson Motor Co.,* 188 S.C. 1, 198 S.E. 417 (1938). (3) a fraudulent Act accompanying the breach. *Vann v. Nationwide Insurance Co., Supra; Hardee v. Penn Mutual Life Insurance Co.,* 215 S.C. 1, 53 S.C. E. 2d 861 (1949). Thus, it is well settled that punitive damages are not recoverable for the mere breach of a private contract in the absence of circumstances giving rise to a cause of action for fraud. *Holland v. Spartenberg Harald-Journal Co.,* 166 S.C. 454; 165 S.E 203 (1932).

26

In the case *sub judice*, this Court erred in allowing the issue of punitive damages under South Carolina law to go to the jury in the absence of sufficient evidence giving rise to a cause of action for fraud. In fact, the Court never engaged in the proper analysis to determine whether such a charge should go to the jury at all. In the Jury Instruction conference on punitive damages counsel for the Defendant stated:

> Mr. De Leo: Yes, your Honor. In that particular e-mail I indicated that the analysis that was undertaken yesterday dealt with whether or not there was willfulness, et. cetera, and that it was our belief and respectful argument that the proper analysis involved whether or not there was sufficient evidence as to the three elements which are listed in the jury instructions where the judge as gatekeeper looks to that evidence to see whether it supports those elements such that it should go to the jury. That was not done last time.

The previous day in advance of the final jury instruction conference on punitives, the Court had stated that because there was evidence of willfulness and wanton conduct, the issue of punitives under both Illinois and South Carolina law should go to the jury. No analysis was ever done as to the three factors as required under South Carolina law. See, e.g., *Floyd vs. Country Squire Mobile Homes, Inc.*, 287 S.P. 51, 336 S.E. 2nd 502 (1985).

The seminal case on breach of contract accompanied by a fraudulent act in South Carolina is the often cited *Welborn vs. Dixon*, 70 S.C. 108, 49 S.E. 232 (1904), which held: "[p]unitive damages are not recoverable for the mere breach of a private contract, in the absence of circumstances giving rise to a cause of action for fraud." Here, the plaintiff never pled any allegations of wilful or malicious conduct and never sought to amend its pleading accordingly to conform with any such evidence. More importantly, the evidence presented in this case simply does not give rise to a cause of action for fraud.

27

First, the evidence was insufficient to send the cause of action to the jury as to the breach of contract. The testimony of both Professor John Freeman and Robert Cummins demonstrated that Defendant Ness Motley sought ethics advice as to the conflict they identified and related to Interclaim which resulted from the offer to settle put forth by the lawyers for Blair Down in the Madison County class action. It is undisputed that Professor Freeman in his letter to Defendant Ness Motley on this subject stated that Ness Motley's duty was to continue to represent the interest of the class. The evidence also showed that Professor Freeman instructed Ness Motley to withdraw from representing Interclaim.

Furthermore, Professor Freeman, in an abundance of caution because the ethics rules of the State of Illinois were applicable, recommended another ethics expert Mr. Cummins to give an opinion. The evidence showed that Mr. Cummins also indicated to the Defendant Ness Motley that it's primary interest was to represent the class and that Ness Motley must withdraw from representing Interclaim due to the conflict presented by the offer of settlement. Furthermore, the testimony of Defendants' expert William Hodes was that the Defendant Ness Motley acted properly in withdrawing as it did and in fact that it was obligated to withdraw from representing Interclaim when faced with the very real conflict. Therefore, because Ness Motley withdrew from the representation of Interclaim due to a conflict, there was no breach.

As to any other type of breach of the contract at issue, the evidence was likewise insufficient. Any allegation as to the use of so called confidential information is insufficient in that: (1) the information was not confidential and (2) Defendant Ness Motley never used the "confidential" information for any purpose other than to further the interest of the class as contemplated by the Retainer Agreement. The only purpose to which Ness Motley used such information to the extent

28

it did so, was to benefit the class. In fact, Ness Motley never actually benefitted in any way from the use of any information from Interclaim in that the settlement was not approved and they have never been paid a penny as a result of this litigation.

Additionally, there can be no breach of contract where there is insufficient proof of either proximate cause or damage to the Plaintiff. See, *Klucznik v. Nikitopoulos*, 152 Ill. App. 3d 323, 503 N. E. 2d 1147, 105 Ill. Dec. 141 (2nd Dist. 1987) (holding that a plaintiff can only recover for those damages which result from the defendant's breach). Here, no act of breach of contract proximately caused any damage to the Plaintiff Interclaim. See, *Madigan Bros., Inc., v. Melrose Shopping Center Co.*, 198 Ill. App. 3d 1083, 556 N.E. 2d 730, 145 Ill. Dec. 112 (1st Dist. 1990).

In the case *sub judice*, at the time of withdrawal by Defendant Ness Motley due to the very real conflict posed by the offer of settlement by Down's attorneys, Interclaim had spent in excess of $7 million pursuing a Civil Asset Recovery Plan which had failed in Canada. The evidence is undisputed, that two out of three of the business ventures of Interclaim were doomed to failure. In addition, this jury concluded that Interclaim's Civil Asset Recovery Plan which necessarily included recovering in a Canadian bankruptcy simply could not be proven. In awarding Interclaim no money on its claim to recover through the Canadian bankruptcy, the jury as fact finder clearly concluded that Interclaim could not prove it would be able to recover any money at all through its Civil Asset Recovery Plan. Finally, because the settlement was not approved and the litigation in Madison County is still ongoing, any damage to Interclaim is merely contingent and cannot support a claim for breach of contract. See, e.g., *Farm v. Credit Bank*, 197 Ill. App. 3d at 104.

Second, there was insufficient evidence of fraudulent intent relating to the breaching of the contract to send the cause of action for punitive damages under South Carolina law to the jury. Here,

29

the evidence presented shows the Defendant Ness Motley sought <u>two</u> ethics opinions immediately after being presented with a conflict, accurately informed Interclaim in a timely manner of its intention and withdrew from representing Interclaim within 30 days of the presentation of the conflict. There was simply no evidence presented from which a jury could infer a fraudulent intent.

Furthermore, an examination of cases alleging breach of contract accompanied by fraudulent act uniformly present circumstances--very different from those at bar--where one party defrauds another party in the context of a contractual relationship. Typical of these cases is the often cited *Floyd, supra*, in which a dealer of mobile homes agreed to arrange financing for a buyer with a certain maximum monthly payment and then fabricated documents to achieve a monthly payment that was substantially higher. The seller subsequently agreed to a refund of the substantial down payment but never followed through. There, evidence was presented that the dealer told the buyers that he had obtained the desired financing when in fact he knew that he had not done so. Furthermore, there was evidence that he created a set of false figures on a yellow sheet which he affirmatively represented as the terms of the financing when in fact he knew that this was not the case. Evidence was also presented that he procured the signatures of the buyers on blank closing documents and then fraudulent filled in different terms from those discussed with the Floyds thereby wrongfully appropriating their down payment because they could not make payments under the contract. In the case *sub judice*, there was no evidence of any *fraudulent* intent on the part of Ness Motley.

Third, this Court erred in submitting the issue of punitive damages on breach of contract accompanied by a fraudulent act to the jury under South Carolina law where there was insufficient evidence of a fraudulent act connected with the breach. Quite simply, there was no evidence

presented by Interclaim as to a *fraudulent act* on the part of Defendant Ness Motley which could

satisfy the third element such that punitive damages would be proper. Here, there was also no tort

which could form the basis for this third element. See, *Lister v. NationsBank*, 329 S.C. 133, 494 S.E.

2d 449 (1997). The only counts that went to the jury were the breach of contract and breach of

fiduciary duty counts- neither of which is a tort claim. See, *Doe v. Roe*, 289 Ill. App. 3d 116, 681

N.E. 2d 640, 224 Ill. Dec. 325 (1st Dist. 1997). The misappropriation of confidential information

count did not go to the jury and is therefore inapplicable. Thus, there is no tort claim that was sent

to the jury and no evidence which could form the basis of the third element. See, *id*.

For these reasons, this court should vacate the punitive damages judgment in its entirety.

VI.    THE PLAINTIFF FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE
       THAT DEFENDANT'S MISCONDUCT WAS WILLFUL, WANTON OR IN RECKLESS
       DISREGARD OF PLAINTIFF'S RIGHTS.

To receive an award of punitive damages, a plaintiff has the burden of proving by clear and

convincing evidence that a defendant's misconduct was willful, wanton or in reckless disregard of

plaintiff's rights. *Lister v. Nationsbank of Delaware*, N.A., 329 S.C.133, 494 S.E. 2d 449 (1997).

Furthermore, in cases in which the issue of punitive damages is submitted to a jury, there must be

clear and convincing evidence of actual malice to justify such an award. *Hainer v. American*

*Medical Intern*, 328 S.C.128, 492 S.E.2d 103 (1997); *Taylor v. Medenica*, 324 S.C.200, 479 S.E.2d 35.

In the case of *sub judice*, it is undisputed that the defendant, Ness Motley, sought not one, but two ethics opinions immediately after being presented with an offer by the attorneys for Blair Down to make full restitution. The evidence showed that Ness Motley had a duty to entertain such an offer. In addition, the evidence showed that Ness Motley relied upon two separate ethics experts' opinions as a basis for its decision to withdraw from representing Interclaim on September 18, 2000. The fact that Ness Motley consulted two ethics experts after this conflict presented itself, very strongly mitigates against any evidence of willful or reckless conduct. The evidence is clear that Ness Motley followed the recommendations of the two ethics' experts as they relate to representation of Interclaim and the class. Although such evidence would not excuse a finding that Ness Motley breached its fiduciary duty or the Retainer Agreement, they do very strongly support the notion that punitive damages should not be imposed. *Kuznik v. Bees Fairy Associates, et al.*, 342 S.C.579, 538 S.E.2d 15 (2000).

In the *Kuznik* case, which involved a real estate deal by various members of a general partnership, the court concluded that the actions which constituted a breach of contract and fiduciary duty were not the type of actions for which punitive damages were proper because the action taken was taken on the advice of counsel. *Kuznik*, 342 S.C. @ 612. That is, the court concluded that although the reliance upon counsel did not excuse the partners' breach of their fiduciary duty and breach of the partnership agreement, they did support the decision not to allow punitive damages.

In the case *sub judice*, Ness Motley relied not on one lawyer but on two. The evidence in this matter showed that immediately following the August 17th meeting at which the Down

32

representatives made the suggestion of settlement, Mr. Hahn informed Interclaim of that conversation almost immediately as well as what he was going to do in response to that offer. Professor Freeman testified that on August 18th he had a phone conversation with Mr. Hahn during which he gave his opinion that Ness Motley's primary obligation was to the class and that he should represent the class to the hilt while Interclaim should get independent counsel. The evidence further showed that this was followed by a letter the following Monday and a letter back on September 6th. In his September 6th letter, Professor Freeman suggested that Ness Motley needed an Illinois opinion because the case was located in Illinois. That opinion was obtained through another ethics expert Mr. Cummins.

Mr. Cummins authored a letter dated September 15 in which he informed Mr. Hahn that he should withdraw from representation of Interclaim and advise Interclaim to get their own counsel. The following Monday, the letter was written from Mr. Hahn to Interclaim formally withdrawing from representing Interclaim. It wasn't until one week later on the 25th that Mr. Hahn informed the the Down representatives of that decision and agreed to the requirement that he proceed with settlement discussions and exclude Interclaim from them.

The evidence presented further showed that Mr. Hahn received a letter on August 23rd asking him to make the aforementioned decision, and Mr. Hahn sent a letter to his co-counsel on August 24th saying he was going to ignore the request from the Down representatives. Such evidence is contrary to the requirement of wilful, wanton and recklessness that is required to award punitive damages in South Carolina or Illinois. Finally, there was testimony from several witnesses for the defendant that having filed an appearance and having acted as class counsel, the duty to the class superseded the duty to Interclaim on whose behalf Ness Motley had filed no pleadings, filed no

33

appearance and acted in accordance with the contract. Interclaim was not a party to the underlying

Madison County class action and was not a victim of Blair Down. Such testimony came directly

from Mr. Cummins, Mr. Freeman and Mr. Hodes.

Based upon the aforementioned, Defendant Ness Motley requests that the verdict on punitive

damages be set aside accordingly or that a new trial be ordered.

VII.    THE JURY'S VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE
        ON THE BREACH OF CONTRACT COUNT AND NESS MOTLEY IS ENTITLED TO
        A NEW TRIAL OR JUDGMENT AS A MATTER OF LAW.

The jury in this case rendered a compensatory verdict of 8.3 million dollars which was

against the manifest weight of the evidence. A jury's verdict must be overturned if it is against the

manifest weight of the evidence. See, e.g., *Calusinski v. Kruger*, 24 F. 3rd 931 (7th Cir. 1994). By

the manner in which the jury was instructed, one can surmise that the award of 8.3 million dollars

was intended by the jury as compensation to Interclaim for damages resulting from a finding that

Ness Motley had breached its contract with Interclaim.

The Plaintiffs alleged in Count III of their Complaint that Ness Motley, beginning on

August 17, 2000 and continuing thereafter, breached its obligations under the retainer agreement by

refusing to comply with the contractual obligations of that contract, specifically, by agreeing to

negotiate with representatives of the Down Group to the exclusion of Interclaim, and by terminating

its representation of Interclaim.

The evidence in this case regarding Interclaim's activities leading up to the execution of the

Retainer Agreement with Ness Motley in February of 2000 was clear and undisputed. Interclaim was

initially contacted with regard to pursuit of the assets of the Blair Down Enterprise in June of 1998.

Thereafter, in August of 1998, Interclaim conceived and implemented what its representatives

34

identified as a Civil Asset Recovery Plan. That plan included institution of legal proceedings by Interclaim in the Province of Alberta, Canada and in the Province of British Columbia, Canada.

In addition to instituting legal proceedings, Interclaim conducted a world wide investigation to locate, identify, and after receipt of the appropriate orders from the Bankruptcy Court in British Columbia, to execute freeze orders against the Down assets world wide.

The asset freeze orders were executed world wide on January 27, 1999. Subsequent thereto, representatives of the Down Criminal Enterprise initiated various procedures to contest the orders that Interclaim had obtained in British Columbia and to seek dismissal of the representative legal proceeding that Interclaim instituted in Alberta, Canada as well as to attack the freeze orders issued by the court in both British Columbia and Alberta.

The evidence is also clear and uncontroverted that it was not until the period in time after the November, 1999 dismissal of the representative action that Interclaim had filed in Alberta, Canada, that Interclaim began to pursue the concept of the United States Class Action Lawsuit on behalf of the United States Victims of the Down Criminal Enterprise; and, it was not until December 7, 1999 that Interclaim had its first meeting with Ness Motley. Thereafter, the evidence has shown that Interclaim had entered into a Retainer Agreement with Ness Motley which was executed in counterparts on February 10, 2000 and February 14, 2000.

The Retainer Agreement entered between Ness Motley and Interclaim was an Exhibit admitted into evidence at trial, the contents of which document were addressed by several witnesses who testified during the course of the trial proceedings.

The gravamen of the Retainer Agreement was that Ness Motley was to institute a Class

Action Lawsuit in the United States, on behalf of the U.S. Victims of the Down Criminal Enterprise, and to prosecute such lawsuit to "final end".

The evidence is further clear and uncontroverted that Ness Motley, in accordance with its contractual obligations, appropriately filed a Class Action Lawsuit on behalf of the U.S. Victims of the Down Criminal Enterprise in Madison County, Illinois in March of 2000. There is no dispute created by the evidence that both Interclaim and Ness Motley were in agreement and worked in concert to move that litigation forward until an occurrence took place on or about August 17, 2000.

On or about that date, August 17, 2000, representatives of the Down Group approached Blair Hahn, an attorney with Ness Motley and class counsel, and suggested to him that settlement negotiations between the Down Group and counsel for the class could be productive. On August 15 or 16, 2000, Mr. Hahn informed representatives of the Interclaim Group that a settlement conference was to take place in Chicago on August 17, 2000. On August 16, 2000, Blair Hahn met with James McGunn and Martin S. Kenny of the Interclaim Group to prepare for the August 17, 2000 meeting in Chicago.

On August 17, 2000, Mr. Hahn met with representatives of the Down Group and in the course of the meeting, representatives of the Down Group informed Mr. Hahn that if settlement discussions were to progress, that class counsel would have to agree that Interclaim could not be a party to the settlement discussions, could not be appraised of the content of the settlement discussions, and could not take anything from the proceeds of the settlement. The Down Group made it clear that Interclaim included any persons affiliated or associated with Interclaim, including the "Interclaim Victims" described in the Retainer Agreement.

During a break in the meeting with the Down Representatives, the evidence is again clear

and uncontraverted that Mr. Hahn attended and participated in a meeting with representatives of Interclaim including Mr. Martin S. Kenny and Mr. Irving Cohen, among others.

Mr. Hahn informed the Interclaim representatives at that meeting, that he would not immediately respond to the demand of the Down Representatives to exclude Interclaim and all persons and parties associated with Interclaim, but would seek the advice and counsel of his partners, from ethics experts, and would advise Interclaim of the decision he made as to how to proceed in the future with representatives of the Down Group.

It is further undisputed that upon leaving that meeting on August 17, 2000, with Interclaim, Mr. Hahn returned to a further meeting with the Down Representatives. His further meeting with the Down Representatives was done with the full knowledge of the Interclaim Representatives who were informed that Mr. Hahn was returning to continue settlement discussions with members of the Down Group.

Further clear and uncontroverted evidence establishes that upon his return to South Carolina from the meeting of August 17, 2000 in Chicago, Mr. Hahn contacted John Freeman, an ethics professor from the University of South Carolina and had a telephone discussion with him on August 18, 2000, and at that time he explained the demands of the Down Group and obtained verbal advice from Professor Freeman advising him that he must proceed with the representation of the class, since he had filed a lawsuit on behalf of the class, and was acting as class counsel, and should withdraw from any further representation of Interclaim and to advise Interclaim that it should seek its own counsel to represent its further interest in these matters.

In addition, Professor Freeman suggested that since the class action litigation was pending in Illinois, that Mr. Hahn should seek the advice of an Illinois Ethics Expert.

37

The evidence further clearly establishes that on August 21, 2000, that Mr. Hahn wrote a letter to Mr. Freeman requesting that the previously described verbal advice be reduced to writing, and Professor Freeman provided such written evidence of his opinion on September 6, 2000.

In addition, Professor Freeman contacted Professor Ronald Rotunda and obtained from him the name of Robert Cummins, an Illinois Ethics Expert. On September 7, 2000, Professor Freeman sent an e-mail message to Mr. Cummins requesting his assistance in reviewing and rendering an opinion with respect to this matter based on Illinois Ethics Law.

Further evidence established that Mr. Hahn had at least one telephone conversation with Mr. Cummins, and Mr. Cummins was provided with a copy of the Retainer Agreement which is the basis for the breach of contract count of this litigation.

On September 15, 2000, Mr. Cummins provided Mr. Hahn with his written ethics opinion advising Mr. Hahn to withdraw from representation of Interclaim and to proceed with his representation of the class, and to advise Interclaim to retain independent counsel to represent its further interest.

Thereafter, the evidence further established that on September 18, 2000, Mr. Hahn wrote a letter to Interclaim withdrawing as their attorney and suggesting that Interclaim obtain independent counsel to further represent its interest in relation to the Down matter. Subsequently, the evidence established that on September 25, 2000, Mr. Hahn wrote a letter to the representatives of the Down Group, for the first time, informing them that he would agree to their demand that they continue to negotiate with the Down Group to the exclusion of Interclaim and any individuals associated or affiliated with Interclaim.

The evidence has further established that prior to writing the September 25, 2000 letter, Mr. Hahn in an internal memo to members of the class counsel team had informed them that he had not yet responded to the demand of the Down Group to exclude Interclaim and was intentionally delaying that response.

In seeking damages from the jury pursuant to its breach of contract claim, Interclaim's attorneys provided the jury with two avenues of potential compensatory relief. First, Interclaim asked the jury to conclude that, absent Ness Motley's breach of its contract with Interclaim, Ness Motley would have successfully obtained a verdict against the Down Group in Madison County, sufficient to bankrupt Blair Down; Interclaim next argued that the judgment obtained in Madison County would have been presented to a Bankruptcy Court in British Columbia, Canada; Interclaim next argued that the Bankruptcy Court in Vancouver, British Columbia would have either reinstated the interim receiver or reappointed the interim receiver after the previously appointed interim receiver had been dismissed by order of July 28, 2000 and would have reinstated the International Claims Enforcement Agreement previously dissolved by the same order of July 28, 2000; Interclaim further argued that it would have been successful in obtaining an order from the Bankruptcy Court in British Columbia declaring Blair Down a bankrupt, and would have successfully liquidated approximately 60 million dollars of assets, resulting in a recovery by Interclaim of 50 percent of the net proceeds of such liquidated assets, and suggested to the jury that that sum of money would have been 27.5 million dollars.

The second element of damages sought to be recovered by Interclaim for Ness Motley's breach of its contract with Interclaim was the sum of 8.3 million dollars. The evidence adduced by Interclaim showed that the 8.3 million dollar figure represented all of the money expended by

Interclaim in the operation of its business for the period of 1998, 1999 and January 1 through September 30, 2000. That sum of money included all the salaries paid by Interclaim to its employees; those salaries that were owed by Interclaim to certain of its employees, but not paid; and, all of the other usual and customary overhead expenses of operating a business including rent, insurance, telephone, copying, computer and related business expenses. Also included in this sum of money was a 33 1/3 claim for lost profits, for which no proof, whatsoever, was offered.

The jury specifically rejected the argument that Interclaim had proven that it was entitled to recover the sum of $27.5 million dollars as damages of breach of contract based on Interclaim's contention that but for the breach of contract that it would have realized that sum of money for the British Columbia Bankruptcy proceedings.

The jury did, however, award the sum of 8.3 million dollars to Interclaim, ostensibly as damages for Ness Motley's breach of its contractual obligations to Interclaim.

Interclaim's overhead in operating its business, its alleged lost profits, and the monies it expended in pursuit of its Civil Asset Recovery Plan during the period from 1998 through September 30, 2000, bears no relationship, whatsoever, to Interclaim's contractual relationship with Ness Motley. The inclusion of that sum of money and the jury's verdict for breach of contract cannot stand.

The Plaintiff's argued to the jury that Ness Motley's agreement to exclude Interclaim from the settlement process, and Ness Motley's withdrawal from further representation of Interclaim on September 18, 2000 and its continuing negotiations with the Down Group on behalf of the class, thereafter, to the exclusion of Interclaim constituted a breach of Ness Motley's contract with Interclaim.

If one were to accept that premise a true, it simply does *not* follow that as a proximate result of that breach of contract, that Interclaim was harmed and that the measure of its damages was the amount of money that it had expended during the years 1998, 1999 and January 1 to September 30, 2000 as reflected in the 8.3 million dollar award of the jury which clearly represented the figures presented to the jury as the value of the Interclaim internal and external expenses.

In fact, the evidence presented to the jury clearly showed that Interclaim had expended $4,036,00.00 in external expenses and $2,359,000.00 in Internal expenses before it ever entered into the contractual relationship with Ness Motley in February of 2000. Of the $1,120,000.00 that Interclaim expended after it entered into its contractual relationship with Ness Motley, $640,743.00 was expended on its two primary Canadian Law Firms, Heenan Blaikie, and Macleod Dixon, in further pursuit of litigation with the representatives of the Down Group relating to the proceedings that had been instituted by Interclaim in Alberta and British Columbia prior to Interclaim's contractual relationship with Ness Motley in February of 2000. The expenditure of those sums of money were not caused by any alleged breach of contract by Ness Motley in August of 2000, or thereafter.

To the contrary, Plaintiff's counsel did not argue to the jury that the 8.3 million dollars represented the amount of money that Interclaim was caused to expend or incur as a result of Ness Motley's breach of contract, but rather, Plaintiff's counsel argued that the 8.3 million dollars represented the value of an asset that Ness Motley had wrongly converted to its own use after withdrawing from its representation of Interclaim and, Plaintiff's counsel argued that the 8.3 million dollars represented the cost of Interclaim's acquiring confidential information that Ness Motley used in negotiating with Down's attorneys on behalf of the class and to the exclusion of Interclaim.

41

However, prior to submission of this case to the jury, counsel for Interclaim proffered instructions to the jury on only two theories of recovery, breach of fiduciary duty and breach of contract, but failed to seek instructions to the jury on the elements of conversion of confidential business information, which had been a Count in its Amended Complaint, and, by failing to seek instructions to the jury on that theory, abandoned that Count of its Complaint prior to submission of the case to the jury.

The primary purpose of damages for breach of contract is to restore the non-breaching party to the position that it was in prior to the breach. See, *Central Information Financial Services, Ltd. v. First National Bank of Decatur*, 128 Ill. App. 3d 1052, 471 N.E. 2d 992 (4th Dist. 1984). In this case, the 8.3 million dollars as compensation for breach of contract clearly does not represent damages intended to restore Interclaim to a position it was in prior to Interclaim's contractual relationship with Ness Motley in February of 2000, since Interclaim had already spent $6,995,000.00 of that sum of money prior to entering into the contractual relationship with Ness Motley. Further, of the $1,120,000.00 that Interclaim spent after it entered into a contractual relationship with Ness Motley, there was an absence of proof that the expenditure of those sums of money were incurred as a result of any alleged breach of contract by Ness Motley.

Thus, there is no basis in law or fact for the jury's award of 8.3 million dollars as compensatory damages for breach of contract as compensatory damages awarded to Interclaim for breach of contract by Ness Motley and an award of that sum of money clearly was not as a proximate result of Ness Motley's breach of contract, the award of that sum of money was also clearly against the manifest of the evidence in this case.

42

Therefore, based upon the foregoing, judgment should be entered on behalf of Defendant Ness Motley. In the alternative, a new trial should be ordered because the jury verdict on the breach of contract count is against the manifest weight of the evidence.

VIII.  THE JURY'S VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE ON THE BREACH OF FIDUCIARY DUTY COUNT AND NESS MOTLEY IS ENTITLED TO A NEW TRIAL OR JUDGMENT AS A MATTER OF LAW.

In rendering its compensatory verdict of 8.3 million dollars. The jury awarded as damages to Interclaim a sum of money that was not and could not have been incurred by Interclaim as a proximate result of any breach of duty by Ness Motley. A jury's verdict must be overturned if it is against the manifest weight of the evidence. See e.g., *Calusinski v. Kruger*, 24 F. 3rd 931 (7th Cir. 1994).

The Plaintiffs alleged in their Complaint, and offered evidence in support of their claim that Ness Motley was guilty of breaching its fiduciary duties, owed to Interclaim, which duties arose out of a certain Retainer Agreement executed on or about February 14, 2000, as well as the attorney client relationship.

Subsequent to the execution of the Retainer Agreement, Ness Motley undertook to pursue legal proceedings on behalf of the class of United States Victims of the Blair Down criminal enterprise.

Commencing on or about August 17, 2000, representatives of the Down Group approached Blair Hahn, an attorney with Ness Motley and suggested that settlement negotiations begin between the Down Group and counsel for the class. On August 17, 2000, at a meeting in Chicago, a representative of the Down Group informed  Blair Hahn that if settlement negotiations were to proceed with the members of the class, that Interclaim and any persons associated or related to

43

Interclaim could not be included in any settlement, nor could they be apprized of any of the settlement negotiations.

Immediately thereafter, the evidence has shown, Mr. Hahn informed officers of Interclaim, namely Martin S. Kenny and Irving Cohen, and others, of the Down Group demand.

On that same date, Mr. Hahn informed the Interclaim representatives that he would not immediately respond to the demand of the Down Representatives, but would seek advice and counsel from his partners, from ethics experts and would advise Interclaim of any decision he made, thereafter.

It is undisputed that Mr. Hahn, upon leaving his meeting with Interclaim on August 17, 2000 returned to meet with the Down Representatives, with the full knowledge of the Interclaim Representatives that Mr. Hahn was going to continue his discussions with the Down Group.

Thereafter, the evidence has shown that Mr. Hahn sought ethics advice from Professor John Freeman, of the University of South Carolina on August 18, 2000, by telephone; on August 21, 2000 by letter, and received a written opinion from Professor Freeman on September 6, 2000. In addition, Mr. Hahn, based upon a referral from Mr. Freeman, sought expert advise from Robert Cummins, an attorney in Chicago, with whom Mr. Hahn had at least one telephone conversation and from whom Mr. Hahn received correspondence dated September 15, 2000 advising him of Mr. Cummins ethics opinion with regard to Mr. Hahn's response to the Down Group demand that he proceed with negations on behalf of the class to the exclusion of the Interclaim Group. Both Professor Freeman and Mr. Cummins advised Mr. Hahn to withdraw from representation of Interclaim and to proceed with his representation of the Class.

Thereafter, on September 18, 2000, Mr. Hahn wrote a letter to Interclaim withdrawing as their attorney and suggesting that Interclaim obtain independent counsel to further represent its interest. Subsequently on September 25, 2000, Mr. Hahn wrote a letter to representatives of the Down Group informing them that he would agree to their demand that he continue to negotiate with the Down Group to the exclusion of Interclaim and any individuals associated or affiliated with Interclaim.

The Plaintiff's have argued and sought jury instructions to the effect that during the period of August 17, 2000 to September 18, 2000, Ness Motley breached its fiduciary duties to Interclaim, thereby proximately causing damage to Interclaim.

In presenting its arguments to the jury, Interclaim's attorneys sought two avenues of compensatory relief. First, Interclaim asked the jury to conclude that absent Ness Motley's breach of its fiduciary duty to Interclaim, Ness Motley would have successfully obtained a verdict against the Down Group in Madison County, sufficient to bankrupt Blair Down; Interclaim next argued that the judgment obtained in Madison County would have been presented to a bankruptcy court in British Columbia, Canada; Interclaim next argued that the bankruptcy court in Vancouver, British Columbia would have either reinstated the interim receiver or reappointed an interim receiver after the previously appointed interim receiver had been dismissed by order of July 28, 2000, and would have reinstated the International Claims Enforcement Agreement previously dissolved by the same order on July 28, 2000; Interclaim further argued that it would have been successful in obtaining an order from the Bankruptcy Court in British Columbia declaring Down a bankrupt, and would have successively liquidated approximately 60 million dollars of Down's assets, resulting in a recovery by Interclaim of 27.5 million dollars through the British Columbia Bankruptcy proceedings.

The jury specifically rejected that argument and by special interrogatory returned in open court declared that Interclaim had failed to meet its burden of proof with regard to that element of damages.

The second element of damages sought to be recovered by Interclaim for Ness Motley's breach of fiduciary duty was the sum of 8.3 million dollars. The evidence adduced at trial by Interclaim showed that the 8.3 million dollar figure represented all of the money expended by Interclaim in the operation of its business for the period 1998, 1999 and January 1 through September 30 of 2000. That sum of money included all of the salaries paid by Interclaim to its employees, those salaries that were owed by Interclaim to certain of its employees, but not paid; and, all of the usual and customary overhead of operating a business, including rent, insurance, telephone, copying, computer and related business expenses. Also included in this sum of money was a 33 1/3 percent claim for lost profits, for which no proof, whatsoever was offered.

The figure of 8.3 million dollars included 5.4 million dollars of monies expended by Interclaim in pursuit of what the evidence demonstrated it called its "Civil Asset Recovery Plan."

Interclaim's overhead in operating its business, its alleged lost profits, and the monies it expended in pursuit of its Civil Asset Recovery Plan during the period from January 1, 1998 to September 30, 2000 bears no relationship, whatsoever, to Interclaim's relationship with Ness Motley. The inclusion of that sum of money in the jury's verdict for breach of fiduciary duty cannot stand.

The clear and uncontested evidence in this case shows that Interclaim was contacted with regard to pursuit of the Blair Down Enterprise in June of 1998, and, thereafter, in August of 1998, began to implement what its representatives identified as a Civil Asset Recovery Plan. James

46

McGunn testified that the Civil Asset Recovery Plan included the institution of legal proceedings by Interclaim in the Province of Alberta, Canada and in the Province of British Columbia, Canada.

In addition to instituting legal proceedings, Interclaim conducted a world wide investigation to locate, identify, and after receipt of the appropriate orders from the Bankruptcy Court in British Columbia, to execute freeze orders against the Down assets worldwide.

The asset freeze orders were executed worldwide on January 27, 1999. Immediately thereafter, representatives of the Down criminal enterprise sought through various legal measures to contest the orders that Interclaim had obtained in British Columbia and to seek dismissal of the representative legal proceeding that Interclaim had instituted in Alberta as well as to attack the freeze orders issued by the courts in both British Columbia and Alberta.

According to the testimony of Mr. McGunn, the difficulty that Interclaim had in the Canadian Courts greatly increased the expense of its Civil Asset Recovery Plan, such that by the middle of 1999 the cash position of Interclaim was very tight. Richard Marsten, James McGunn, Irving Cohen and Martin Kenney all deferred either all or a portion of their salary to assist Interclaim in remaining solvent while it continued the pursuit of its Civil Asset Recovery Plan through the Canadian Court system and elsewhere.

The evidence is clear that it was not until a period in time after the November 1999 dismissal of the representative action that Interclaim filed in Alberta, Canada that Interclaim began to pursue the concept of a US Class Action Lawsuit on behalf of the United States Victims of the Down Enterprise; and it, was not until December 7, 1999 that Interclaim had its first meeting with Ness Motley. Thereafter, the evidence has shown that Interclaim entered into a Retainer Agreement with Ness Motley which was executed in counter parts on February 10, 2000 and February 14, 2000.

47

The Retainer Agreement required Ness Motley to institute a Class Action Lawsuit in the United States, on behalf of the US victims of the Down Criminal Enterprise and to prosecute such lawsuit to "final end."

Ness Motley filed the appropriate Class Action Lawsuit in Madison County, Illinois in March of 2000 and there is no dispute created by the evidence, that the parties were in agreement with the progress of that lawsuit until the time, at or about August 17, 2000, described above, when the Down Group made settlement overtures to counsel for the class, and made a condition of those settlement discussions, the exclusion of Interclaim.

As described above, the Plaintiff's argued to the jury that Ness Motley in agreeing to exclude Interclaim, and withdrawing from further representation of Interclaim and negotiating with the Down Group on behalf of the class, to the exclusion of Interclaim, breached its fiduciary duty to Interclaim. If one were to accept that premise as true, it simply does not follow that as a proximate result of that breach of fiduciary duty, that Interclaim was harmed and that the measure of Interclaim's damages was the amount of money it had expended during the years 1998, 1999 and January 1 to September 30, 2000 as reflected in the 8.3 million dollar award of the jury which clearly represents the value of the Blair Down internal and external expenses.

The evidence presented to the jury clearly showed that Interclaim had expended $4,636,000.00 in external charges and $2,359,000.00 in internal expenses before it entered into its Retainer Agreement with Ness Motley. Of the $1,120,000 that Interclaim expended after it entered into the settlement agreement with Ness Motley; $640,743.00 was expended on its two primary Canadian law firms, Heenan Blaikie and Macleod Dixon in further pursuit of litigation with the representatives of the Down Group relating to the proceedings instituted by Interclaim in Alberta and

48

British Columbia and not in any way relating to any damages caused by an alleged breach of fiduciary duty by Ness Motley in August or September of 2000.

To the contrary, Plaintiff's counsel argued to the jury that the 8.3 million dollars represented the value of an asset that Ness Motley had wrongfully converted to its own use after withdrawing from its representation of Interclaim and represented the cost of Interclaim's acquiring confidential information that Ness Motley used to its advantage in negotiating with Down's attorneys.

However, prior to submission of this case to the jury, counsel for Interclaim proffered instructions to the jury on only two theories of recovery, breach of fiduciary duty and breach of contract. It failed to seek instructions to the jury on the elements of conversion of confidential business information, which had been a count in its amended complaint, and abandoned that theory of recovery.

There is no basis in law or fact for the jury's award of $8.3 million dollars as compensation for breach of fiduciary duty, and such an award by the jury is clearly against the manifest weight of the evidence and should be vacated. Therefore, based upon the foregoing, judgment should be entered on behalf of Defendant Ness Motley. In the alternative, a new trial should be ordered because the jury verdict on the breach of fiduciary duty count is against the manifest weight of the evidence.

XI.    THE COMPENSATORY AWARD IN THE AMOUNT OF $8.3 MILLION DOLLARS
       WAS IMPROPER AND MUST BE VACATED BECAUSE THE "VALUE OF
       CONFIDENTIAL INFORMATION" WAS AN IMPROPER MEASURE OF DAMAGES
       AND SUCH DAMAGES WERE NOT PROXIMATELY CAUSED BY ANY CONDUCT
       OF NESS MOTLEY.

First, the compensatory award is improper and must be vacated because the "value of confidential information" is an improper measure of damages under either a breach of contract or

49

a breach of fiduciary duty cause of action. As a threshold matter, because the plaintiff dropped its'

count for misappropriation of confidential information and only instructed the jury on the claims of

breach of fiduciary duty and breach of contract, only breach of contract and breach of fiduciary duty

claims are relevant to a proper damage award. That is, the failure to put the missapropriation count

to the jury and instruct it accordingly equals a withdrawl of that claim. See, *Onderisin v. Elgin J. &*

*E. Ry.*, 20 Ill. App. 2d 73, 155 N.E. 2d 338 (2 Dist. 1959).

In a breach of contract action, the underlying purpose for awarding monetary damages is to

place the non-breaching party in the same position he would have been if the contract had been

performed as promised. *Alimissis v. Nanos*, 171 Ill. App.3d 1005, 525 N.E.2d 1133 (1st Dist. 1988);

see also, *Sitton v. MacDonald*, 25 S.C. 68. Damages are not, however, intended to provide the

injured party with a windfall recovery. *In re: Estate of Wernick*, 127 Ill.2d 61, 535 N.E.2d 876

(1989); *Fieldstein v. Guinan*, 148 Ill.App.3d 610 (1st Dist. 1986). Similarly, a count for breach of

fiduciary duty is controlled by the substantive laws of agency, contract, and equity. *Doe v. Roe*, 289

Ill.App.3d 116, 681 N.E.2d 640 (1st Dist. 1987); *Kinzer v. City of Chicago*, 128 Ill.2d 437, 455, 539

N.E.2d 1216 (1989). Under Illinois law, even in the context of an attorney-client relationship, a

breach of fiduciary duty is not a tort. *Doe*, 289 Ill.App.3d @ 128.

In general, damages under breach of contract are meant to protect the contracting party's

three interests: expectation, reliance and restitution. See, e.g. *Elson v. State Farm Fire & Casualty*

*Co.*, 295 Ill.App.3d 1, 691 N.E.2d 807 (1st Dist. 1998); see also, *Sitton v. MacDonald*, 25 S.C. 68.

Expectation damages are the usual form of recovery in breach of contract actions. See, Restatement

(Second) of Contracts, Section 344 comment A and Section 347 comment A (1981). In some cases,

however, the plaintiff may wish instead to protect the interests other than, or in addition to, his

50

expectation interests. Among those alternative forms of recovery are reliance damages. Such reliance damages may include expenditures made in preparation for or in a performance of the contract, less any loss they would have suffered had the contract been fully performed. Typically, plaintiffs will seek reliance damages when they cannot, with sufficient certainty, establish the extent of their loss. See, Restatement (Second) of Contracts, Section 349 comment A (1981).

In the case *sub judice*, the plaintiff sought both expectation and reliance damages on each count that went to the jury. The expectation damages were characterized as damages obtained through the Canadian Bankruptcy proceeding and were denied by the jury on both counts. In such instances, reliance damages may be awarded in order to place the party in the position it would have been in had there been no contract – a return to the *status quo*. See Restatement (Second) of Contracts, Section 349.

In the case *sub judice*, the vast majority of the $8.3 Million which makes up the award of compensatory damages by the jury consists of expenses incurred by Interclaim in prosecuting its Civil Asset Recovery Plan long before the signing of the Retainer Agreement between Interclaim and Ness Motley in February of 2000. As a result, such damages were not incurred in reliance on the Retainer Agreement and are not recoverable. *Chicago Coliseum Club v. Dempsey*, 265 Ill.App. 542 (1932) (holding no recovery for expenses prior to signing agreement for heavyweight championship fight; *Bruber v. S.M. News Co.*, 126 F. Supp. 442 (S.D.N.Y. 1954) (holding no recovery for printing plates made before contract); *Hough v. Jay-Dee Realty Inv.*, 401 S.W.2d 545 (MO App. 1966) (holding no recovery for expenses prior to execution of Agreement of construction of restaurant building); see gen., 46 Yale L.J. 373-377 (1937); (Restatement (Second) Section 349.

51

Second, the general rule is that in an action for breach of contract, a party can recover only on damages which naturally flow from and are the result of the act complained of. *O'Conner v. Nolan*, 64 Ill. App. 357; see also, *Sitton v. MacDonald*, 25 S.C. 68. . Furthermore, compensation for damages for a breach of contract must be established by evidence from which a court or jury are able to ascertain the extent of such damages by the usual rules of evidence into a reasonable degree of certainty. *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 515 N.E.2d 61 (1987); *Id.*. Furthermore, if the special damage would have occurred regardless of the breach, a plaintiff cannot recover damages for that item. *William Ziegler & Son v. Chicago Northwestern Development Co.* 71 Ill.App.3d 276, 389 N.E.2d 195 (2nd Dist. 1979).

In the case *sub judice*, the $8.3 million figure which the plaintiff sought and was awarded under the heading of "value of confidential information" consisted of what it classified as "external and internal expenses." The external expenses which totaled approximately, $5,405,822.35 consisted of expenses that were paid to a variety of vendors beginning in early 1998 and ending in September of 2000. Of the total external expenses, approximately $4,636,364.26 were costs incurred before February 10, 2000, which is the earliest date the parties could have entered into the Retainer Agreement. The remainder of the total-- $786,408.65--was incurred after February 10, 2000. However, the vast majority of this expense was incurred in paying the law firm of Macleod Dixon & Hennan Blaikie in further prosecuting the Canadian actions–which was unrelated to any act or mission of this Defendant and which the jury said could not be recovered under the Civil Asset Recovery Plan. The money spent prior to the signing of the Retainer Agreement is unrecoverable as a matter of law. See, e.g. *Chicago Coliseum Club*, 265 Ill.App. 542, *et. al.* In addition, the

52

conduct complained of by Ness Motley did not proximately cause these damages as a matter of law. *Id.*

As to the internal expenses, the plaintiff claimed a total of approximately $2,349,163.13 comprised of allocated salary, allocated overhead and profit attributed to Down. Again, those expenses are claimed for 1998, 1999 and the year 2000 through September. Similarly, those expenses of allocated salary and allocated overhead are not recoverable as a matter of law prior to the signing of the Retainer Agreement in February of 2000. For example, in 1998 Interclaim estimated that it spent $270,063.00 in employee salary attributable to the Down matter. This salary estimate, aside from being speculative, was voluntarily incurred by Interclaim in pursuit of its civil asset recovery plan long before it ever met or had thought of Ness Motley. On this, the evidence is undisputed. Therefore, Interclaim could not have relied upon the contract which was entered into in February of 2000 in incurring these damages and they are unrecoverable as a matter of law. *Id.* Thus, of the allocated salary claimed as damage as part of the $8.3 million during the period from 1998 through September of 2000, totaling $1,276,060.00, approximately $976,675.84 was incurred prior to the execution of the Retainer Agreement on February 10, 2000. As a result, this portion is unrecoverable as a matter of law.

Similarly, the plaintiff claimed $237,192.00 in allocated overhead in 1998 as part of its damages for "value of confidential information". This $237,192.00 was again spent in overhead such as copy machines and rent before Interclaim had ever thought about Ness Motley. In short, such damages are unrecoverable as a matter of law. Of the allocated overhead, approximately $801,743.25 was incurred prior to February 10, 2000 and it is therefore unrecoverable.

53

In addition, the plaintiff's calculation of damage in arriving at the $8.3 Million figure included "profit attributed to Down." First, the evidence was uncontradicted that 2 out of 3 of the ventures entered into by Interclaim were failures. In addition, this jury as finder of fact, concluded that it could not award damages to Interclaim on its recovery via the Madison County class action and the Canadian bankruptcy litigation. Therefore, the jury concluded that it was *not* more probably true than not that Interclaim could recover through the Madison County class action and the Canadian bankruptcy. As a result, the lost profit element of the plaintiff's damages are both speculative and unrecoverable as a matter of law. See, Restatement (Second) Section 352. Finally, the lost profits were not properly calculated under either Illinois or South Caolina law.

For these reasons, this Court should vacate the jury's award of $8.3 million, enter judgment as a matter of law in favor of the Defendant or dismiss the entire action herein on the grounds that the jury's award of $8.3 million in compensatory damages is improper as a matter of law based upon the absence of proof on the issue of proximate cause.

X.    THIS LEGAL MALPRACTICE ACTION WAS BROUGHT PREMATURELY BECAUSE
      THE UNDERLYING CLASS ACTION CASE IN MADISON COUNTY HAS NOT BEEN
      RESOLVED.

It is fundamental law in Illinois and elsewhere that a legal malpractice case cannot be brought until the Plaintiff has suffered actual damages as a result of the asserted negligence of the lawyer. The elements of a legal malpractice claim are: (1) the existence of an attorney-client relationship that establishes a duty on the part of the attorney; (2) a negligent act or omission constituting a breach of that duty; (3) proximate cause establishing that "but for" the attorney's negligence, the plaintiff would have prevailed in the underlying action; and (4) actual damages. *Serafin v. Seith*, 284 Ill. App.3d 577, 586-87, 219 Ill. Dec. 794, 672 N.E.2d 302 (1996). The injuries resulting from legal

malpractice are not personal injuries but pecuniary injuries to intangible property interests. *Glass v. Pitler*, 276 Ill. App.3d 344, 349, 212 Ill. Dec. 730, 657 N.E.2d 1075 (1995). Damages must be incurred and are not presumed. *Farm Credit Bank v. Gamble*, 197 Ill. App.3d 101, 103, 143 Ill. Dec. 844, 554 N.E.2d 779 (1990), and the plaintiff must affirmatively plead and prove that he suffered injuries as a result of the attorney's malpractice. *Bartholomew v. Crockett*, 131 Ill. App.3d 465, 86 Ill. Dec. 656, 475 N.E.2d 1035 (1985). Where the mere possibility of harm exists or damages are otherwise speculative, actual damages are absent and no cause of action for malpractice yet exists. See *Farm v. Credit Bank*, 197 Ill. App.3d at 104, 143 Ill. Dec. 844, 554 N.E.2d 779.

The cause of action for legal malpractice does not accrue on the date of an alleged breach of duty but rather when the client incurs actual damages therefrom. *Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App.3d 349, 703 N.E.2d 473 (1998).

Illinois courts have frequently recognized, either expressly or implicitly, a cause of action for legal malpractice will rarely accrue prior to the entry of an adverse judgment, settlement, or dismissal of the underlying action in which plaintiff has become entangled due to the purportedly negligent advice of his attorney. *Lucey v. Law Offices of Pretzel & Stouffer*, 301 Ill. App. 3d 349, 703 N.E.2d 473 (1st Dist. 1998); *Glass v. Pitler*, 276 Ill. App. 3d 344, 354-55, 657 N.E.2d 1075 (1st Dist. 1995) (where plaintiffs claimed that, contrary to the advice of defendant attorneys, their pension funds would not have been protected from creditors had they filed a petition for bankruptcy, damages were speculative, and malpractice action properly dismissed, since there was no ruling by a bankruptcy court and law was unsettled); *Bartholomew v. Crockett*, 131 Ill. App. 3d 456, 465, 475 N.E.2d 1035 (1st Dist. 1985) (where attorney's negligence resulted in dismissal of one of two tortfeasors in plaintiff's suit, malpractice action properly dismissed as premature since actual

55

damages would occur only if plaintiff failed to recover or failed to fully recover against remaining tortfeasor); *Bronstein v. Kalcheim & Kalcheim*, 90 Ill. App. 3d 957, 959-60, 414 N.E.2d 96 (1st Dist. 1980) (dismissing as premature plaintiff's malpractice complaint against attorneys for negligent tax advice, since issuance of a Notice of Deficiency did not establish plaintiff had suffered a loss; plaintiff would have actionable damages only after a liability determination was made by Tax Court). In *Lucey*, the Court held that damages were only speculative until the underlying case was decided adversely to the plaintiff; thus the trial court's decision to dismiss the complaint for legal malpractice was affirmed. *Lucey*, 301 Ill. App. 3d 359, 703 N.E.2d 480-81.

Decisions from jurisdictions outside Illinois also shed light on whether a claim for legal malpractice is premature. In *Boerger v. Levin*, 812 F. Supp. 564 (E.D. Pa. 1993), the plaintiff, Boerger, hired an attorney, Levin, to represent him in a mortgage foreclosure action. Before that action had concluded, Borger sued Levin for legal malpractice. The court granted Levin's motion to dismiss holding that the claim lacked justiciability. The Court stated that "[s]ince the underlying suit in which Levin represented Boerger has not yet been adjudicated, Boerger cannot show that Levin's performance proximately caused his injury or even that he was injured at all." *Boerger*, 812 F. Supp. at 565. The Court continued: "the mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm-- not yet realized--does not suffice to create a cause of action for negligence.... [U]ntil the client suffers appreciable harm as a consequence of his attorney's negligence, the client cannot establish a cause of action for malpractice." *Boerger*, 812 F. Supp. at 565 citing *Budd v. Nixen*, 6 Cal. 3d 195 (1971).

In another Eastern District of Pennsylvania case, *Bowman v. Abramson*, 545 F. Supp. 227 (E.D. Pa. 1982), a judgment against the plaintiff had been issued in a medical malpractice claim in

56

an underlying suit. The case was appealed. However, before the appeal was decided the plaintiff sued his attorney for legal malpractice. The Court dismissed the legal malpractice claim for lack of justiciable controversy.

However, the decision in *Jones v. Law Firm of Hill and Ponton*, 223 F. Supp. 2d 1284 (M.D. Fla 2002), suggests that a final decision is not absolutely necessary as long as it is reasonably clear that the client has actually suffered some damage from legal advice or services. *See also Porter, III v. Ogden, Newell & Welch*, 241 F.3d 1334 (11th Cir. 2001). The *Jones* court also stated that generally the redressable harm is not established until final judgment is rendered. *Jones*, 223 F. Supp. 2d at 1287. Even so, the court favorably cited the 11th Circuit test for determining when a cause of action for legal malpractice has accrued - the cause of action exists when a "redressable harm has been established." *Jones*, 223 F. Supp. 2d at 1287 citing *Porter, III*, 241 F.3d at 1339-40. Nevertheless, the claim in *Jones* was dismissed because the proof of actual damages was too speculative. *Jones*, 223 F. Supp. 2d at 1292.

Public policy suggests that allowing a legal malpractice claim to go forward while the underlying suit is pending is improper. *See United States National Bank of Oregon v. Davies*, 274 Or. 663 (Or. 1976) (simultaneous litigation may be "disastrous" to both attorney and client, since client will be taking polar positions in each suit permitting his impeachment in his defense of the underlying suit); *Dearborn Animal Clinic v. Wilson*, 248 Kan. 257 (Kan. 1991) (following *Davies*) (rejecting argument that malpractice action accrued when plaintiff's incurred attorney fees due to attorney's alleged negligence).

Generally, to recover for legal malpractice there must be proof of actual damages proximately caused by the defendant's negligence. *See, Betty v. Wood*, 204 F.3d 714 (7th Cir. 2000); (*Pal v.*

57

*Sinclair*, 90 F. Supp. 2d 393 (S.D. N.Y. 2000) ("Under Illinois and New York law, plaintiff in legal malpractice action must demonstrate actual damages"). Legal malpractice claims are routinely dismissed, as in *Boerger*, *Bowman*, and *Jones*, where the plaintiff's proofs of actual damages are speculative. *See also*, *Igen v. White*, 672 NY Supp. 2d 867 (1998) (dismissing plaintiff's complaint that sought recovery for future damages allegedly resulting from attorney's failure to inform his client of the deadline date for filing a patent); *Thompson v. Halvonik*, 36 Call. App. 4th 657 (1995) (granting summary judgment to defendant attorney in legal malpractice claim where plaintiff's proof of damages was too speculative); *Alhino v. Starr*, 112 Cal. App. 3d 158 (1980) ("until the client suffers appreciable harm as a consequence of his attorney's negligence, the client cannot establish a cause of action for malpractice"); *Colbert v. Conybeare Law Office*, 239 Mich App. 608 (2000) (affirming summary judgment in favor of law firm where plaintiff's proof of damages relied solely on speculation). Stated another way, in order to succeed on a legal malpractice claim, a plaintiff/client must show that his underlying case was meritorious. *See Betty*, 204 F.3d at 715. In most instances, this cannot be accomplished until the underlying case has a final judgment including appeals.

This claim is by Interclaim of legal malpractice on the part of Ness Motley should have been dismissed by the Court as premature. The case is still pending in Madison County Illinois and many different results which could moot the issue presented by this litigation are possible. Down could win. Down could have a judgment entered against him that he could satisfy in the U.S. The class could ultimately not be certified based upon a variety of issues including lack of commonality and fraud issues which were discussed at trial. That is, a whole range of senarios could unfold in which

Interclaim would never recover any money even if Ness Motley had done everything desired by Interclaim.

Defendant Ness Motley objected throughout this case that the action was premature. The Court nevertheless allowed the action to proceed at the jury instruction conference before counsel moved for a directed verdict on this ground:

> Mr. Tunney: "We'd move for a directed verdict on the issue of proximate cause with respect to the damages. There's been a failure of the evidence to prove damages with the degree of certainty required by law, and the only way this jury will be able to calculate damages in this case is by the use of guess, speculation, and conjecture. Your Honor, the amount of damages that have been presented to the jury are too uncertain and will require speculation and, therefore, they failed to meet their burden in that regard."

> Mr. De Leo: "As a supplement to that, Your Honor, in addition to the motion for directed verdict on the issue specifically of proximate cause, we would also move on the basis that the plaintiffs have failed to offer sufficient competent evidence regarding damages, in other words, the fact of actual damages. So in addition to proximate cause and the speculation issue it's also the failure to establish or show competent evidence as to actual damage."

> "It is well-settled that an attorney is not liable for a damage claim that is remote and speculative. We referred to that in a couple of citations, *DMI, Inc., vs. Country Mutual Insurance Company*, 82 Ill.App. 3d 113, Third District, a 1980 case, in addition, *Chicago and Milwaukee Electric Railroad Company v. Ulrich*, and 213 Ill. 170 is the cite, an old Illinois case."

59

"Again, where damage is a mere possibility and no actual harm has occurred, there can be no recovery, and that issue is well-settled in Illinois, Your Honor. Here there has been no competent evidence that Interclaim has suffered actual harm. In terms of some broader cases, Your Honor, that are not factually dissimilar to the case here, I'm going to cite a few cases, Your Honor, which I would ask you to take a look at."

"The first is *Boerger v. Levaine, Esquire* and that's B-o-e-r-g-e-r at 812 Federal Supp. 564. It's a U.S. District case, Your Honor, out of the Eastern District of Pennsylvania. It's a 1993 case. It's malpractice, an attorney malpractice case where the court concluded that because the bankruptcy, which was the underlying case within that case, Your Honor, was not concluded, they had suffered no loss."

"In addition, Your Honor, I would ask you to take a look at the Igen case, I-g-e-n, Inc., versus White, and the cite on that is 250 AD 2d at 463. That Court, again, in a malpractice case concluded that no present damages existed barring future damages where they were speculative and no recovery was allowed."

Ms. McNally: "What court is that? Sorry."

Mr. De Leo: "That's okay. That is a court in New York."

The Court: "Appellate division."

Mr. De Leo: "A New York Appellate court case. I apologize for just giving you the AD cite."

Ms. McNally: "Okay."

Mr. DeLeo: "The last case in that regard, Your Honor, is Culvert versus Corybar, C-o-r-y-b-a-r, Law Office, and the cite for that is 239 Mich. App. 608. That's a Michigan Appeals Court case, Your Honor. It's a 608, so a 2000 case where the court concluded that there must be actual injury, not merely, quote, the potential for injury, end quote."

"I'd just say very briefly, Your Honor, that here the evidence has shown that there has been no actual harm to the plaintiffs in this matter. There's been no settlement, as the testimony has come from each witness, in the underlying Madison County class action. Defendant Ness Motley and co-counsel are attempting to move that action forward. The representative action in Alberta is under appeal. That is also unresolved, Your Honor."

"While some evidence of assets of Blair Down has come in as to the dissipation of some of those total assets, Your Honor, it's also come into evidence that more than $11 million in assets have been preserved in the trust and also that the Renior assets have been preserved, and finally, Your Honor, you have an unmotivated class where you've never had more than 10 percent response even by Interclaim's own mailing."

"So in brief, Your Honor, in order to be very brief for our purposes this evening, I just want to put on the record that in terms of our motion for directed verdict."

"The case in Madison County is pending at this very moment and there has been no recovery by the class. It is possible that the defendant in that underlying

61

case may prevail and receive a not guilty. Moreover, a class action may not be
supportable under Illinois law. There could be commonality problems. The alleged
damages to Interclaim are completely speculative and contingent. Further, as noted
above, the underlying case will not be over until all approval possibilities are
exhausted."

For these reasons, this court should vacate the judgment and dismiss the action herein on the grounds
of prematurity.

XI.     THIS COURT SHOULD DISMISS THIS CAUSE BECAUSE PLAINTIFF, INTERCLAIM
        IS INVOLVED IN CHAMPERTY.

It is clear that Interclaim has gone from being an investigator that helps people find assets
that the people are entitled to for already recovered judgments, to going into the business of finding
assets first and then finding the people for whom they stir up litigation.

This Court candidly so described the business of Interclaim in the memorandum opinion
denying defendant's motion to dismiss:

> Plaintiff, Interclaim acquires and enforces complex, multi-jurisdictional liquidated
> claims, judgments, or debts, paying the owners of such claims cash or a contingent
> amount payable upon successful enforcement. Interclaim then dedicates resources
> necessary to investigate and enforce claims.

This is the type of claim that Plaintiff, Interclaim, had filed in Madison County, Illinois. It
charged the elderly victims of the fraud 50% of the recovery for its assistance to the victims.

This is plainly champerty, a practice that is prohibited in Illinois. *Berlin v. Nathan*, 64 Ill.
App.3d 940, 381 N.E.2d 1367 (1978).

The practice is likewise condemned in South Carolina in *Oprey, Inc. v Cabana Limited Partnership*, 340 S.C. 367, 532 S.E.2d 269 (2000), when the Supreme Court abolished champerty as a defense but preserved the concept of it:

> Our abolishment of champerty as a defense does not mean that all such agreements are enforceable as written. When an agreement to finance a lawsuit is challenged, the court must "consider whether the fees charged are excessive or whether any recovery by a prevailing party is vitiated because of some impermissible overreaching by the financier." *Saladini*, 687 N.E.2d at 1227. *383. The court must be guided by an analysis of what is fair and reasonable under the circumstances.
>
> The court may examine (1) whether the respective bargaining position of the parties at the time the agreement was made was relatively equal (2) whether both parties were aware of the terms and consequences of the agreement, (3) whether the borrowing party may have been unable to pursue the lawsuit at all without the financier's help, (4) whether the financier would retain a disproportionate share of the recovery, and (5) whether the financier engaged in officious intermeddling. See *Saladini*, 687 N.E.2d at 1227; *Osprey*, 333 S.C. at 330-31, 509 S.E.2d at 279. A financier becomes an officious intermeddler when he or she offers unwanted advice or otherwise attempts to control the litigation for the purpose of stirring up strife or continuing a frivolous lawsuit. See *Smith v. Hartsell*, 150 N.C. 71, 63 S.E. 172, 174 (1908) (stating it has come to be generally accepted that an agreement will not be condemned as champertous unless the interference is clearly officious and for the purpose of stirring up strife and continuing litigation); *Osprey, supra*; *Kraft, supra*. After analyzing these factors and any others the court deems relevant, the court may enforce, modify, or set aside the financing agreement.

Under these tests, Interclaim's business is a fraud upon the victims it purports to help and is a fraud upon the judicial system.

As to factor 1, the relative bargaining positions of Interclaim and the victims is completely unequal. As to factor 2, it is doubtful whether the elderly claimants were aware of the consequences of the agreement. As to factor 3, the victims could have maintained the lawsuit themselves and Interclaim should merely have found the assets. As to factor 4, Interclaim does retain a

disproportionate share of the recovery (i.e., 50%, which is much more than a lawyer could demand). As to factor 5, Interclaim is expressly in the business of officious intermeddling.

The Court should refuse to allow Interclaim to conduct champerty in the case in Madison County and by extension in this legal malpractice case. Specifically, this court should find that the Retainer Agreement is unenforceable and that the individual power of attorney agreements between Interclaim and the 29 which were the basis of Interclaim's involvement in the Madison County Class action are likewise unenforceable.

The entire judgment should be set aside on these grounds.

WHEREFORE, for the foregoing reasons, Defendant moves that this court grant its motions for a new trial, for a judgment as a matter of law and for remittitur or for any other relief this court deems just and proper.

Respectfully submitted,

PRICE TUNNEY REITER, P.C.

By: _____
Anthony J. Tunney

Attorneys for Defendants
123 North Wacker Drive, Suite 2220
Chicago, Illinois 60606

64