# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7620 | **DATE** | 1/8/2004 |
| **CASE TITLE** | Interclaim Holdings Limited vs. Ness, Motley, Loadholt, Richardson & Poole | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion And Order. Ness Motley's motion for a new trial, judgment as a matter of law and for a remittitur (103-1, 103-2, 103-3) is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | 3 number of notices | **Document Number** |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | JAN 1 2 2004 date docketed | |
| | Notified counsel by telephone. | | H9 |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | 1/8/2004 date mailed notice | |
| | Copy to judge/magistrate judge. | | |
| ETV | courtroom deputy's initials | ETV mailing deputy initials | |

U.S. DISTRICT COURT
CLERK

'04 JAN -9 PM 3:47

Date/time received in
central Clerk's Office

| | | |
|---|---|---|
| INTERCLAIM HOLDINGS LIMITED and<br>INTERCLAIM RECOVERY LIMITED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 00 C 7620 |
| | ) | |
| NESS, MOTLEY, LOADHOLT,<br>RICHARDSON & POOLE, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

**DOCKETED**
**JAN 12 2004**

## MEMORANDUM OPINION AND ORDER

Interclaim Holdings Limited and Interclaim Recovery Limited ("Interclaim") is in the business of identifying, tracing, and freezing assets that have been laundered by financial criminals, and then getting those assets liquidated and distributed as restitution to the criminals' victims and as compensation to Interclaim. In this case, Interclaim retained the law firm of Ness, Motley, Loadholt, Richardson & Poole ("Ness Motley") to bring class action proceedings on behalf of victims of a complex criminal network run by James Blair Down ("Down" or "Down Group"). Without notice to or consent from Interclaim, Ness Motley began settlement negotiations with Down and, at Down's insistence, excluded Interclaim from the discussions. Ultimately, Ness Motley withdrew as Interclaim's counsel citing a conflict of interest, and pursued a settlement arrangement that would limit Down's financial exposure to Ness Motley's remaining clients while providing a large fee to the law firm. Interclaim filed suit against Ness Motley alleging breach of fiduciary duty and breach of the parties' retainer agreement. Interclaim also alleged a separate claim of misappropriation of confidential information but opted not to argue that claim at trial.

A jury found in favor of Interclaim, awarding $8.3 million in compensatory damages and $27.7 million in punitive damages. Ness Motley now seeks a new trial, judgment as a matter of

149

law, and remittitur with respect to both awards. For the reasons set forth here, the motions are denied.

## BACKGROUND

The evidence presented at trial substantially confirmed the allegations in Interclaim's complaint, which this court detailed in its October 21, 2001 Memorandum Opinion and Order ("Order"). *See Interclaim Holdings Ltd. v. Ness, Motley, Loadholt, Richardson* & Poole, No. 00 C 7620, 2001 WL 1313799, at *1-7 (N.D. Ill. Oct. 29, 2001). This opinion assumes the reader's familiarity with the earlier decision and will summarize the relevant facts here only briefly.

Interclaim is an international business that acquires and enforces complex, multi-jurisdictional liquidated claims, judgments, or debts, paying the owners of such claims cash or a contingent amount payable upon successful enforcement. In cases involving hundreds or thousands of fraud victims, Interclaim first seeks court approval for compensation for services performed on behalf of all the victims. The company then gathers information about suspected criminals and their assets to find money rightfully belonging to the criminal's victims, and seeks judicial orders to preserve or "freeze" those assets pending a showing that they stem from criminal dealings. (Def. Mem., at 2; Tr. 220-23.)

In June of 1998, after being contacted by the Federal Bureau of Investigation and the U.S. Attorney in Seattle, Interclaim agreed to help recover the monies lost by hundreds of thousands of U.S. citizens to the Down Group's enterprise, namely, the illegal use of mass mail solicitation and telemarketing to sell shares or other interests in large pools of foreign and domestic lottery tickets and other contests. *Interclaim*, 2001 WL 1313799, at *1-2; (Tr. 91-92, 117, 226-27.) U.S. and Canadian authorities had pursued Down for several years. He violated at least 22 U.S. Postal Service cease and desist orders, and in 1997, a federal grand jury in Seattle indicted Down on 145 counts of interstate gambling, conspiracy, and money laundering. Down fought extradition from

Canada to the U.S. and after protracted negotiations, he pled guilty to a federal gambling felony and agreed to spend six months in prison and forfeit $12 million he had in a Seattle account. (Def. Mem., at 2; PX 212; Tr. 135-36.) The U.S. Attorney used that money as a restitution fund for approximately 450 of 900 identified victims of Down's enterprise. (Tr. 417.)

In an effort to help Interclaim recover additional funds stolen by Down, the U.S. Attorney in Seattle introduced Interclaim to a number of his victims, and Interclaim entered into power of attorney agreements with 29 of them (the "Interclaim victims"). Interclaim obtained the authority to prosecute claims and recover monies Down had stolen from the 29 individuals, who themselves represented a larger group of victims. *Interclaim*, 2001 WL 1313799, at *2; (Tr. 125-26, 250-51.)

Over the next few months, Interclaim successfully located $100 million of Down's assets around the world and obtained court orders freezing those assets. (Tr. 127.) Interclaim also purchased $670,000 of the Down Group's outstanding trade debt to a data processing and mass mailing company, a printing company, and a telephone company. Through this purchase, Interclaim acquired an electronic list of 418,256 names and addresses of victims of Down's criminal enterprise. *Interclaim*, 2001 WL 1313799, at *2; (Uncontested Facts, Ex. A to Def. Mem. ¶¶23, 24.) That list provided details on more than $28.5 million Down took from the identified victims. (Tr. 258-59.)

Sometime before the end of 1998, Interclaim retained Canadian law firms to commence involuntary bankruptcy proceedings against the Down Group in Vancouver, British Columbia and Calgary, Alberta. At Interclaim's request, the Canadian court appointed Arthur Andersen, Inc. ("Andersen") as interim receiver and approved an International Claims Enforcement Agreement ("ICEA") between Andersen and Interclaim. *Interclaim*, 2001 WL 1313799, at *2; (PX 23; Tr. 406.) Under that agreement, Interclaim committed to fund the operations of Andersen up to $3 million and to assist it in identifying, locating, and recovering the illicit proceeds worldwide. In return,

Interclaim was to receive a return of its direct costs plus fifty percent of any assets recovered in the bankruptcy, up to a maximum of fifty percent of the proven claims of creditors. *Id.*

The proceedings in Canada did not go well. In August 1999, the bankruptcy proceedings were dismissed on the ground that the power of attorney and trade debt purchase agreements assertedly violated the English common law doctrine against champerty.[1] In November 1999, the Alberta court struck the class action portion of Interclaim's representative proceeding on grounds that Alberta lacks a class action procedure. Shortly thereafter in January 2000, the Alberta court drastically reduced the amount of the Down Group's frozen assets concerning the representative proceeding but maintained the asset preservation power of Andersen with respect to the other pending bankruptcy proceeding. *Interclaim*, 2001 WL 1313799, at *3.

In response to these setbacks, Interclaim decided to commence a class action suit in the United States in the hopes of obtaining a judgment from an American court and using it to facilitate the liquidation of Down's assets in Canada. *Interclaim*, 2001 WL 1313799, at *2-3; (Tr. 461-67.) Interclaim retained Ness Motley to bring the class action proceedings in the U.S. and provided the firm with information and documents it had developed in the case. On February 14, 2000, Interclaim and Ness Motley executed a Retainer Agreement in which Ness Motley acknowledged that it was relying on Interclaim's detailed information and work in accepting the retainer. (PX 72, at 1-14.) The agreement required Ness Motley to "keep all documents and information provided to it by Interclaim in confidence." *Interclaim*, 2001 WL 1313799, at *3-4.

On March 10, 2000, Ness Motley filed a class action complaint against Down, his sister-in-law Cindy Whitehead-Down, and two others in Madison County, Illinois. (PX 84.) On August 7, 2000, the Circuit Court in Madison County entered a TRO barring the defendants from disposing

---

[1]        This decision was ultimately reversed on appeal in January 2001, but the immediate effect of the ruling jeopardized the likelihood of recovering illegally obtained monies from the Down Group. *Interclaim*, 2001 WL 1313799, at *3, n.1.

of or transferring any interests in the $50-$60 million in assets previously frozen in the Canadian bankruptcy proceeding. *Interclaim*, 2001 WL 1313799, at *5; (PX 120.) Approximately one week later on August 15, 2000, Interclaim representatives met with Blair Hahn of Ness Motley in St. Louis, Missouri to prepare for a preliminary injunction hearing. When the Interclaim representatives arrived, Hahn informed them for the first time that the firm had agreed to engage in settlement talks with Down and postpone the hearing. *Id.*; (Tr. 342-43.) On August 17, 2000, Ness Motley met with Down's attorneys without Interclaim representatives present and reached a tentative agreement to (a) employ a low $5 million "trigger" allowing Down to call off the settlement if the victims' claims exceeded that amount; (b) provide a large $2 million fee to Ness Motley; and (c) exclude Interclaim and the 29 victims it represented from participating in the settlement negotiations. (PX 150, 147; Tr. 364-65, 716-17.)

During a break in discussions with Down, Hahn informed the Interclaim representatives about the proposed settlement terms. The representatives told Hahn that Interclaim objected to the proposed terms and outlined facts calling into doubt Down's representations about the case and the extent of his assets. (Tr. 153, 363-64, 957.) Hahn explained that he had already provisionally agreed to Down's demand and that Ness Motley may have a conflict of interest in representing Interclaim and the 29 Interclaim victims in addition to the other class members. (Tr. 154.) Hahn told Interclaim that the firm would take no action until it resolved the potential ethical conflict; contrary to those assurances, however, Hahn in fact continued to negotiate with Down. (Pl. Mem., at 9-10.)

On September 18, 2000, Ness Motley finally notified Interclaim of its "withdrawal from representation of Interclaim." (PX 170.) Ness Motley claims it was acting on the advice of two ethics experts in withdrawing; the evidence at trial revealed, however, that the firm did not make full disclosures to those experts in obtaining their opinions. For example, Ness Motley led one expert to believe that it did not have an attorney-client relationship with Interclaim (Tr. 1561-62),

5

and led the second expert to believe both that the proposed settlement with Down would benefit the class and that Ness Motley and Interclaim had specifically contemplated that the firm would continue to represent the class in the event of a conflict of interest. (Tr. 1592-93; PX 169; Pl. Mem., at 10-13.)

After Ness Motley withdrew as Interclaim's counsel, it continued to negotiate with Down and agreed to settlement terms that were not in the best interests of the class. (Pl. Mem., at 13-14.) The firm opposed Interclaim's attempt to intervene in its own behalf in the Madison County litigation, voluntarily dismissed Cindy Whitehead-Down as a defendant in that case, and agreed to dissolve the TRO with respect to both Cindy and James Blair Down. The dissolution of the TRO resulted in the release of all judicial control over the $50-$60 million in net assets frozen by Interclaim. (Id. at 14-15; Tr. 373, 851-52; PX 207 Attachment C.) The settlement was never finalized, however, because after substantial negative publicity, the Madison County court rejected the proposal.[2]

On December 4, 2000, Interclaim filed its initial complaint against Ness Motley. The amended complaint, filed on June 22, 2002, alleged breach of fiduciary duty, breach of contract, and misappropriation of confidential information, though Interclaim abandoned this last claim before trial. At trial, Interclaim argued that Ness Motley breached its fiduciary duties of loyalty, honesty, and fidelity, and the duty to preserve and protect Interclaim's confidential information and refrain from using that information in ways adverse to Interclaim. Interclaim also argued that Ness Motley breached the Retainer Agreement by, among other things, agreeing to negotiate a settlement on terms adverse to Interclaim, and by improperly and unilaterally terminating its representation of Interclaim. Interclaim sought compensatory damages for the money it would have received in the

---

[2]     At the time of trial, the Madison County litigation remained pending. Hahn testified that little to no discovery had been conducted in that case. (Tr. 844-46.)

Canadian bankruptcy proceeding, and for the value of confidential information it provided to Ness Motley. (Ex. B to Pl. Mem.)

After both parties presented their evidence, Ness Motley orally moved for judgment as a matter of law (calling it a motion for directed verdict), arguing that: (1) it would be speculative for the jury to calculate damages Interclaim expected to recover in future proceedings in Canada; and (2) Interclaim failed to offer sufficient evidence of injury. (Tr. 1751-54.) The court entered and continued both motions. (Tr. 1760.) While the jury was deliberating on the issue of liability, Ness Motley further argued that its conduct did not warrant punitive damages and that such an award of damages was barred by 735 ILCS 5/2-1115. (Tr. 1996-2002, 2017-23.) The court rejected the former argument and reserved ruling on the latter. (Tr. 2002-03, 2020.) The jury returned a verdict for Interclaim on both the breach of fiduciary duty and breach of contract claims.

Interclaim argued to the jury that Ness Motley's use of confidential information resulted in damages in the amount of $8.3 million, and that Ness Motley's breach of the retainer agreement resulted in losses equivalent to the amount Interclaim expected to recover in the Canadian proceedings, calculated conservatively at $27.7 million. Though the jury awarded nothing for the bankruptcy theory of damages, it awarded $8.3 million for the confidential information theory. (Ex. B to Def. Mem.) After hearing evidence concerning Ness Motley's ability to pay, as well as closing arguments and instructions on punitive damages, the jury awarded Interclaim an additional $27.7 million in punitive damages.

## DISCUSSION

In its motion for a new trial, judgment as a matter of law, and remittitur, Ness Motley has made a number of scattered arguments. The court understands the firm's primary arguments as falling into three categories: (1) the compensatory damage award is premature and speculative because the Madison County litigation is not yet resolved and, moreover, Ness Motley did not

7

misappropriate Interclaim's confidential information; (2) the punitive damage award is statutorily barred under Illinois law; and (3) the punitive damage award is excessive.

Before addressing these three main arguments, the court turns briefly to a handful of other matters. First, Ness Motley does not dispute Interclaim's contention that the firm waived the following arguments by failing to raise them prior to the close of trial: (1) Interclaim failed to request punitive damages in its pleadings; (2) Interclaim did not establish a cause of action for fraud sufficient to support punitive damages for the breach of contract claim; and (3) Interclaim engages in champerty. Federal Rule of Civil Procedure 50(b) allows a party to "renew its motion for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment - and may alternatively request a new trial . . . under Rule 59." FED. R. CIV. P. 50(b). Generally, to preserve a motion for post-trial consideration, a party must raise it at the close of all evidence at trial. *See Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1364 (7th Cir. 1996) (Rule 50(b) requires that "a motion for judgment as a matter of law be made at the close of all evidence in order to be preserved for post-trial consideration").

Here, Ness Motley never raised any of these issues before filing its post-trial motion and, thus, none provides a basis for judgment as a matter of law. *See, e.g., Liu v. Price Waterhouse LLP*, 182 F. Supp. 2d 666, 676 (N.D. Ill. 2001) (plaintiff waived objection to validity of a copyright by "rais[ing] this issue for the first time in a post-trial argument"). With respect to the alleged pleading deficiency, moreover, Ness Motley knew early in the case that Interclaim intended to seek punitive damages; thus, the firm's assertion of "great prejudice" has no merit. (Def. Mem., at 14; Pl. Mem., at 39-40.) In addition, Ness Motley's assertion that under South Carolina law, the breach of contract claim could not go to the jury absent "sufficient evidence giving rise to a cause of action for fraud" is not supported in the law. (Def. Mem., at 27.) *See Harper v. Ethridge*, 348 S.E.2d 374, 378 (S.C. Ct. App. 1986) (a plaintiff need not allege elements of common law fraud and deceit to state a claim for breach of contract accompanied by fraudulent act; "[t]he fraudulent act is any act

8

characterized by dishonesty in fact, unfair dealing, or the unlawful appropriation of another's property by design").

It is not clear from Ness Motley's opening memorandum whether it intended to argue that the jury's findings of liability on the breach of fiduciary duty and breach of contract claims — separate and apart from the damages awards — were against the manifest weight of the evidence. (Def. Mem., at 28-30, 34-43, 43-49.) The firm makes no clear response to Interclaim's arguments regarding these claims, however, and appears to have abandoned them. To the extent Ness Motley does address some of the arguments in piecemeal fashion throughout its reply memorandum, the court considers them in its discussion below where appropriate. In addition, to be thorough, the court notes that Ness Motley does not challenge Interclaim's assertion that the firm waived its general objections to the sufficiency of the evidence on liability by failing to raise them before the jury began deliberations. FED. R. CIV. P. 50(b). Moreover, the firm makes no compelling response to Interclaim's substantial evidentiary showing in support of both verdicts and has not demonstrated that they were "against the weight of evidence," or the result of an unfair trial. (Pl. Mem., at 19-27, 44-46.) *See Westchester Fire Ins. Co. v. General Star Indemnity Co.*, 183 F.3d 578, 582 (7th Cir. 1999). Thus, these arguments in and of themselves do not support any of Ness Motley's post-trial motions.

Finally, the court sees no merit in Ness Motley's assertion that Interclaim presented insufficient evidence of willful or wanton conduct by Ness Motley to support an award of punitive damages. (Def. Mem., at 31-34.) Ness Motley notes that it sought "not one, but two ethics opinions" and claims that it merely followed the experts' advice in withdrawing as Interclaim's counsel. (*Id.* at 32-33.) According to the firm, this behavior "strongly militates against any evidence of willful or reckless conduct." (*Id.* at 32.) As noted earlier, however, Interclaim presented evidence that Ness Motley did not provide the experts with all the relevant facts when it obtained their opinions. (Pl. Mem., at 10-13; Tr. 1561-61, 1592-93, 1996-2003; PX 169.) Moreover, Interclaim's

9

own nationally-recognized ethics expert, Professor Ronald Rotunda, testified forcefully that full consideration of the facts leads to the conclusion that Ness Motley's conduct was plainly improper. (Tr. 461-527; PX 245.) "[B]asically [Down's] lawyer would like [Ness Motley] to sell down the river, to sell out some of its clients in exchange for – for money. And that's not a conflict. That's an outrage." (Tr. 474.) Thus, there was sufficient evidence from which the jury could reasonably conclude that Ness Motley's conduct was willful and wanton, and the firm's objection on this basis is overruled. *Parham v. Chicago Board of Educ.*, 79 F.3d 1150 (7th Cir. 1996) ("[g]reat deference traditionally has been accorded to a jury's verdict, and we shall not set aside the decision of a jury if a reasonable basis exists in the record to support that verdict").

The court now turns to Ness Motley's principal arguments.

## A.    The Compensatory Damages Award

Ness Motley argues that the award of $8.3 million in compensatory damages is premature because the Madison County litigation is not concluded. Ness Motley characterizes the case as a "legal malpractice action" and insists that such a cause of action accrues only when there is an adverse judgment or settlement in the underlying lawsuit. (Def. Mem., at 54-62.) Interclaim responds that Ness Motley waived this argument by failing to make it at the close of trial and by failing to request a stay of the case pending a final determination in the Madison County litigation. (Pl. Mem., at 28-29.) The court agrees with Interclaim.

In its motion "for directed verdict," Ness Motley argued that "Interclaim had failed to prove damages with the requisite degree of certainty and that the jury will be forced to calculate damages 'by use of guess, speculation, and conjecture.'" (Def. Reply, at 7.) *See Chicago and North Western Transp. Co. v. Soo Line R. Co.*, 739 F. Supp. 447, 448-49 (N.D. Ill. 1990) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)) (the "threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical'"). The mere fact that the amount of Interclaim's

damages may be difficult to calculate, however, does not establish that Interclaim suffered no injury such that the case was premature. *Cf. Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App. 3d 349, 355, 703 N.E.2d 473, 478 (1st Dist. 1998) ("[w]hen uncertainty exists as to the very fact of damages, as opposed to the amount of damages, damages are speculative"); *Hinrichs v. Whitburn*, 975 F.2d 1329, 1333 (7th Cir. 1992) ("[c]ases are unripe when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts"). More importantly, prior to trial, this court asked counsel for both parties whether either side requested a stay of the case pending resolution of the downstate case. Both sides answered in the negative. By doing so, Ness Motley waived any argument that the case was not ripe for adjudication.

Even if Ness Motley's ripeness argument were properly before the court, it is at base an objection that the jury could not have assessed compensatory damages without speculating as to the success of the Madison County and Canadian bankruptcy proceedings. (Def. Mem., at 58-62; Def. Reply, at 9.) Ness Motley claims that "[t]he inescapable question is what Interclaim might have recovered in Canada had Ness Motley not breached the Retainer Agreement." (Def. Reply, at 4.) As Ness Motley sees it, "[t]here can be no possibility of loss to Interclaim absent a favorable resolution of the Madison County litigation and subsequent uncollectibility in Canada." (*Id.* at 6.) This argument fails as well because the jury's compensatory damages award was based on the value of Interclaim's confidential information, not the Canadian bankruptcy theory. Interclaim presented substantial evidence regarding its work and expense in obtaining confidential information relating to Down and his assets, and the jury reasonably concluded that the information had value irrespective of the outcome of the Madison County and Canadian bankruptcy proceedings. *See Gorlikowski v. Tolbert*, 52 F.3d 1439, 1446 (7th Cir. 1995) ("a jury's damage award is vacated only if the verdict is so monstrously excessive or if there is no rational connection between the evidence on damages and the verdict") (internal quotations omitted).

Ness Motley disagrees, arguing that the value of confidential information is not a proper measure of damages at all. (Def. Mem., at 49-54.) Ness Motley first suggests that Interclaim cannot recover any such expenses because they accrued before the parties executed the Retainer Agreement and Interclaim did not incur them in reliance on that agreement. (*Id.* at 42, 51-53.) The single Illinois case Ness Motley cites in support of this argument is seventy years old and plainly distinguishable. In *Chicago Coliseum Club v. Dempsey*, 265 Ill. App. 542, 1932 WL 2782 (1st Dist. 1932), the plaintiff entered into a contract with defendant William Harrison Dempsey to promote him in a public boxing exhibition. *Id.* at *1. Prior to signing Dempsey, the plaintiff contracted with boxer Harry Wills to fight Dempsey in the public match. *Id.* Dempsey ultimately backed out of the fight and the plaintiff sought to recover, among other things, the expenses it incurred in signing Wills. The court found such damages speculative because the plaintiff entered the Wills contract before it signed Dempsey and the contract was not contingent upon Dempsey's agreement to fight. Moreover, the plaintiff had never paid Wills any money under his contract. *Id.* at *4.

In this case, Interclaim sought damages for the lost value of its confidential information, not for expenses incurred in anticipation of entering a Retainer Agreement with Ness Motley. (Pl. Mem., at 33.) The fact that the information was not obtained for, or at the direction of, Ness Motley in no way establishes that the jury was unreasonable in concluding that the information had value that was destroyed by the firm's actions.

Nor is the court concerned about whether Interclaim established the elements of a misappropriation claim. (Def. Reply, at 9-12.) Interclaim provided Ness Motley with detailed information regarding Down's victims and the identity and location of $50-$60 million in net assets he allegedly stole from them and attempted to hide worldwide. As noted, Interclaim did not pursue a separate misappropriation cause of action but, instead, presented Ness Motley's misuse of confidential information as evidence to support its claim that the firm breached its fiduciary and contractual duties. Ness Motley's reliance on *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,

342 F.3d 714 (7th Cir. 2003), in which the plaintiff alleged misappropriation of trade secrets under the Illinois Trade Secrets Act, is therefore misplaced. Ness Motley insists that Interclaim's information was not in fact confidential because it "was either used or to be used in the proceedings Interclaim had brought against Down in Canada and Madison County and throughout the world." (Def. Reply, at 12; Def. Mem., at 28.) The jury disagreed, however, presumably concluding that information such as where and how the Down group had squirreled away assets was indeed valuable, but irretrievably lost its value when Ness Motley agreed to permit the court to lift the orders freezing those assets.

Ness Motley's cited cases do not demonstrate that the jury's decision on the breach of fiduciary duty and breach of contract claims was against the manifest weight of the evidence. For example, Ness Motley cites *Curtis 1000, Inc. v. Suess*, 24 F.3d 941 (7th Cir. 1994), where the plaintiff charged its former employee with breach of his covenant not to compete. Proof of such a claim under Illinois law requires a showing of a protectable interest in confidential information. *Id.* at 947 (covenants not to compete may only protect "trade secrets, confidential information, and relations with 'near-permanent' customers of the employer"). Interclaim advanced no such claim against Ness Motley. Nor did Interclaim allege that the firm improperly turned over its confidential information to Down. *Cf. FMC Corp. v. Boesky*, 852 F.2d 981 (7th Cir. 1988) (defendant engaged in insider trading in violation of federal securities and racketeering laws). Rather, Interclaim argued that its former law firm used its proprietary information to negotiate a "sweetheart" deal with Down that resulted in the release of Down's frozen assets, which effectively "neuter[ed] the value of the information." (Pl. Mem., at 31-32.)

Ness Motley disputes that the information is now valueless, arguing that "until the Madison County litigation is at an end, it is impossible to determine what will happen." (Def. Reply, at 15.) Interclaim, however, presented evidence to the contrary which showed that when Ness Motley unilaterally agreed to dissolve the TRO against James Blair Down and Cindy Whitehead-Down, it

13

also agreed to the release of all judicial control over $50-$60 million in net assets Interclaim had worked to identify, locate and freeze. Interclaim's information identifying those assets which have now disappeared is arguably useless, and the jury could reasonably conclude that the damage has been done no matter what happens in the underlying case.

This court has recognized that not all legal malpractice actions constitute a "case within a case" requiring the resolution of an underlying lawsuit. In *Alper v. Altheimer & Gray*, 65 F. Supp. 2d 778 (N.D. Ill. 1999), the Alpers owned a discount merchandising business which they transferred to Dollar Tree Stores ("DTS") with the legal assistance of defendants Altheimer & Gray and two named attorneys. The Alpers only wanted to transfer their retail business, but the defendants drafted an agreement that transferred both the retail and wholesale merchandising business. *Id.* at 778. The Alpers ultimately sued the defendants for, among other things, professional negligence and breach of fiduciary duty. In a motion for summary judgment, the defendants argued that the claim was premature because the Alpers had not yet resolved their separate claims against DTS and one of the Alpers' former employees, Timothy Avers. *Id.* at 783.

The court disagreed. "[A]t the heart of most malpractice actions is an underlying lawsuit, and the issues of duty, breach, causation and damages are all a function of the attorney's performance in that underlying proceeding." *Id.* at 784. The Alpers, however, had already suffered a tangible loss when they transferred their wholesale business to DTS. "The Alpers' damages do not depend on the outcome of some other litigation; the suit against DTS and Avers would affect who, if anyone, the Alpers could recover from, not whether they are injured." *Id.* at 786.

Although this case is more akin to the traditional malpractice action, the court concludes it also does not present the typical situation in which the plaintiff asserts a "case within a case." As noted, Interclaim asserts that it has lost the value of its confidential information so that its damages do not depend on the outcome of the Madison County litigation. Notably, Interclaim is not even a party to that underlying lawsuit; Ness Motley itself objected to Interclaim's intervention. On these

facts, the jury's determination of value is not speculative and is sufficiently supported by the evidence. *See Alper*, 65 F. Supp. 2d at 785 (noting that cases which found prematurity based that determination on the fact that damages were too speculative). *See also Bruso v. United Airlines, Inc.*, 239 F.3d 848, 856 (7th Cir. 2001) ("the plaintiffs must show that there is no rational connection between [the award] and the evidence") (internal quotations omitted); *Parham*, 79 F.3d 1150 ("[g]reat deference traditionally has been accorded to a jury's verdict, and we shall not set aside the decision of a jury if a reasonable basis exists in the record to support that verdict").

With respect to the actual calculation of damages, Ness Motley argues that it was improper for Interclaim to present evidence of its pre-agreement costs in obtaining the confidential information as a method of establishing the information's value. To support its theory, Interclaim relies on *Jensen v. Chicago and Western Indiana R. Co.*, 94 Ill. App. 3d 915, 936, 419 N.E.2d 578, 595 (1st Dist. 1981), in which the plaintiff brought an action for conversion of certain steam locomotive engines, railroad cars, parts, and tools stored on the defendant railroad company's premises. *Id.* at 918, 419 N.E.2d at 518. The property had been sold to a scrap dealer and the court found that "[i]n determining the value of property that cannot be restored, the finder of fact may consider the purchase price as a basis for valuation, as well as any other evidence that is material to the issue of value." *Id.* at 936, 419 N.E.2d at 595.

Ness Motley presents several arguments against applying the *Jensen* theory here, none of which is availing. Ness Motley insists that this case involves legal malpractice, not conversion, so damages are "limited to the actual amount plaintiff would have recovered had he been successful in the underlying litigation." (Def. Reply, at 14) (quoting *Eastman v. Messner*, 188 Ill.2d 404, 412, 721 N.E.2d 1154, 1158 (1999)). This is essentially an argument that the case was not ripe, which, as noted earlier, the court deems waived. In any event, the jury awarded damages only for the lost value of Interclaim's confidential information, which loss was not dependent upon the outcome of the Madison County or Canadian bankruptcy proceedings. *Compare Eastman*, 188

Ill.2d at 411, 721 N.E.2d at 1158 (plaintiff had to establish the result of the improperly litigated underlying action where the "basis of the plaintiff's legal malpractice claim [was] that the plaintiff would have been compensated for an injury caused by a third party, absent negligence on the part of the plaintiff's attorney").

Ness Motley notes that, unlike in *Jensen* where there was no ascertainable measure of the lost property's value, the ICEA between Interclaim and Andersen "defines with clarity how much Interclaim would be *eligible* to receive (not how much it would get)." (Def. Reply, at 14-15.) As Ness Motley sees it, Interclaim's maximum recovery of direct costs could not have exceeded $2 million as provided in the ICEA unless, perhaps, it was successful in the underlying litigation. (*Id.* at 5-6.) The court does not recall Ness Motley making any such argument to the court or to the jury and concludes it is waived. Moreover, a fair reading of the ICEA reveals that while Interclaim had no obligation to spend more than $2 million, there was no stated cap on Interclaim's recovery of direct costs. (PX 23.)

In a further effort to distinguish *Jensen*, Ness Motley also reiterates that the information has not been rendered valueless, and that value cannot be determined until the underlying litigation is resolved. The court has already rejected these arguments and will not revisit them here. *See supra*, at 11, 13. Ness Motley has presented no convincing reason why the jury should not have considered Interclaim's expenses in obtaining its proprietary information as a measure of value, and the court will not set aside the award of compensatory damages on this basis.

Ness Motley's final objection to the compensatory damages award is that it was improper for Interclaim to seek a 33.3% profit on overhead and salary. Ness Motley argues, without record citation, that Interclaim's $8.3 million figure included salaries Interclaim paid or owed to its employees; overhead of operating a business, such as rent, insurance, telephone, copying, and computer expenses; and a 33.3% claim for lost profits. (Def. Mem., at 46.) Ness Motley insists that Interclaim had no profit history itself or any competitors "on whose track record the jury could

predict. . . what Interclaim's profits might have been." (Def. Reply, at 9-10.) In addition, the firm objects that indirect costs such as overhead expenses cannot be included in calculating profit damage. (*Id.* at 10.)

Interclaim responds that it did not seek reimbursement for overhead or expected profits: "Interclaim was calculating a proxy for the value of its work and, in doing so, included a reasonable hourly rate for its workers. As with any business, the hourly rate charged by an employer includes elements of overhead and profit." (Pl. Sur-Reply, at 12.) The evidence presented at trial supports Interclaim's argument. Interclaim sought to recover the cost of work performed by lawyers, investigators, and in-house specialists in putting together the case against Down, including hourly rates that factored in elements of overhead and profit. (*Id.* at 11.) There is no evidence that the jury erred in accepting Interclaim's theory of damages and, thus, the court declines to set aside or reduce the jury's award.

In sum, there is a reasonable basis for the jury's award and calculation of compensatory damages. *See To-Am Equip. Co. v. Mitsubishi Caterpillar Forklift America, Inc.*, 152 F.3d 658, 664 (7th Cir. 1998) ("where the existence of damages is established, the evidence need only tend to show a basis for the computation of damages with a fair degree of probability") (internal quotations omitted); *American Nat'l Bank & Trust Co. of Chicago v. Regional Transp. Auth.*, 125 F.3d 420, 436-38 (7th Cir. 1997) ("a jury has wide discretion in determining damages, so long as it has a reasonable basis"). Ness Motley's motion for a new trial, judgment as a matter of law, and remittitur on this issue is denied.

## B.    The Punitive Damages Award

After determining that Ness Motley breached both its fiduciary and contractual duties to Interclaim, the jury awarded Interclaim $27.7 million in punitive damages. Ness Motley argues that

17

the punitive damages award must be vacated because (1) it is barred by Illinois statute; and (2) it is excessive.

### 1.   Statutory Bar

Ness Motley first claims that the punitive damages award is barred by 735 ILCS 5/2-1115, which governs punitive damages in legal malpractice cases. Section 5/2-1115 provides that:

> In all cases, whether in tort, contract or otherwise, in which the plaintiff seeks damages by reason of legal, medical, hospital, or other healing art malpractice, no punitive, exemplary, vindictive or aggravated damages shall be allowed.

"[T]he availability of punitive damages depends on whether plaintiffs' breach of fiduciary duty claim falls within 'the rubric of [legal] malpractice.'" *Brush v. Gilsdorf*, 335 Ill. App. 3d 356, 360, 783 N.E.2d 77, 80 (3d Dist. 2002) (quoting *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 351, 736 N.E.2d 145, 155 (1st Dist. 2000)). In making this determination, the court must consider the "nature of the behavior" at issue in the case. *Safeway Ins. Co. v. Spinak*, 267 Ill. App. 3d 513, 518, 641 N.E.2d 834, 837 (1st Dist. 1994).

As a preliminary matter, Interclaim argues that Ness Motley waived this argument by failing to raise it until after the jury began deliberations on the issues of liability and compensatory damages. (Pl. Mem., at 40.) Interclaim points out that though Ness Motley was always aware of Interclaim's intent to seek punitive damages for its fiduciary duty claim, the firm never raised the statutory bar defense at any time before the case went to the jury and, indeed, previously agreed that punitive damages were available under Illinois law. (Pl. Sur-Reply, at 15.) *See* PX G, Def. Mem. in Response to Motion to Compel (Mar. 4, 2003) ("although it is correct that under Illinois law, breach of fiduciary duty claims can be the basis for punitive damages as the Plaintiff argues, they cannot here be a basis for such damages because the complaint fails to allege [sufficient] facts"). Interclaim argues that had Ness Motley raised the statutory bar defense in a timely manner, it would have raised additional arguments and theories of relief at trial. (Pl. Sur-Reply, at 15-16.)

18

The court agrees that Ness Motley waited until the eleventh hour to advance its statutory bar theory and Interclaim has a fair argument that it was prejudiced by the delay. (Tr. 2017-23.) There is at least some authority in Illinois that § 5/2-1115 does not apply to cases involving fraud, and Interclaim may have presented different evidence or asserted different claims had it been aware of Ness Motley's statutory bar defense. *See Cripe v. Leiter*, 291 Ill. App. 3d 155, 158-59, 683 N.E.2d 516, 519-20 (3d Dist. 1997) (common law fraud does not constitute legal malpractice triggering statutory bar to punitive damages). *But see Calhoun v. Rane*, 234 Ill. App. 3d 304, 599 N.E.2d 1318 (1st Dist. 1992) (§ 5/2-1115 bars punitive damages in cases alleging malpractice, even if conduct was intentional or fraudulent); *Russell by Russell v. Good Shepard Hosp.*, 222 Ill. App. 3d 140, 583 N.E.2d 672 (2d Dist. 1991) (§ 5/2-1115 bars punitive damages even if plaintiff alleges "willful" or "wanton" conduct). Contrary to Ness Motley's assertion, the rationale behind Rule 50(b) arguably does apply under these circumstances. (Def. Reply, at 29 n.20) (citing *Laborers' Pension Fund v. A & C Environmental, Inc.*, 301 F.3d 768, 775 (7th Cir. 2002)) ("[t]he purpose of requiring that the [Rule 50] motion be made after the submission of all the evidence, but before the case is given to the jury, is to afford the opposing party an opportunity to cure any defect in its case before the jury retires"). Thus, an argument can be made that Ness Motley waived its objection to the award of punitive damages based on § 5/2-1115. Even if it did not, however, as explained below, the court concludes that the statute does not bar the jury's award of punitive damages in the circumstances presented here.

### a.    Breach of Contract

The Retainer Agreement stated that it "shall be governed and construed in all respects in accordance with the laws of the State of South Carolina." (PX 72.) Accordingly, the parties agreed to South Carolina jury instructions for the breach of contract claim. In its reply memorandum, however, Ness Motley argues for the first time that notwithstanding the choice of law provision, §

5/2-1115 bars the punitive damage award to the extent it is based on the breach of contract claim. (Def. Reply, at 23.)

Ness Motley first contends that § 5/2-1115 is procedural, not substantive, and that "[c]hoice of law provisions in contracts are generally understood to incorporate only substantive law, not procedural law such as statutes of limitation." (Def. Reply, at 23) (quoting *Federal Deposit Ins. Corp. v. Petersen*, 770 F.2d 141, 142 (10th Cir. 1985)). *See also Imaging Fin. Servs., Inc. v. Graphic Arts Servs., Inc.*, 172 F.R.D. 322, 328 (N.D. Ill. 1997) (applying Massachusetts substantive law to breach of contract claim pursuant to choice of law provision, but Illinois' procedural statute of limitations). In support of this argument, Ness Motley notes that § 5/2-1115 is located in the Illinois Code of Civil Procedure,[3] and that Illinois courts have found "no vested right to a particular method of procedure or remedy" that would bar the retroactive application of amendments to remedial statutes. *See Probasco v. Ford Motor Co.*, 182 F. Supp. 2d 701 (C.D. Ill. 2002) (§ 5/2-604.1 regarding pleading of punitive damages was procedural where it was "expressly labeled as a pleading provision" and located in the pleading section of the Illinois Code); *Dardeen v. Heartland Manor, Inc.*, 186 Ill. 2d 291, 299, 710 N.E.2d 827, 832 (1999) (plaintiff who had not yet obtained an award of judgment had no vested right to statutory provision allowing treble damages so the repeal of that provision did apply retroactively to plaintiff's pending suit).

Interclaim responds that "[u]nder well-settled Seventh Circuit precedent, choice of law provisions incorporate both substance and remedy." (Pl. Sur-Reply, at 18.) In *Agfa-Gevaert, AG v. A.B. Dick Co.*, 879 F.2d 1518, 1524 (7th Cir. 1989), for example, the court found that parties to a contract with a New York choice of law provision "more likely than not . . . intended New York law to govern not only the question whether there was a breach of contract but also the question of the

---

[3]      Of course, "[f]ederal courts deciding state law claims do not follow state procedural requirements." *MCI Worldcom Network Servs., Inc. v. Big John's Sewer Contractors, Inc.*, No. 03 C 4991, 2003 WL 22532804, at *3 (N.D. Ill. Nov. 7, 2003).

extent of liability for any breach," which is the "usual approach to choice of law questions." *Id.* at 1524. The court explained that "[i]n contract cases especially, the issue of the proper remedy often is just as important as the issue whether the contract was broken; so the choice of law clause would be broken-backed if it excluded issues of remedy." *Id.* at 1525.

The court is not persuaded that § 5/2-1115 is procedural merely because it is located in the Illinois Code of Civil Procedure, or because it is a remedial statute that does not confer vested rights. As Ness Motley itself points out, § 5/2-1115 is designed to substantively address a perceived litigation crisis in malpractice cases in Illinois and channel behavior outside the courtroom. (Def. Reply, at 27) (citing *Unzicker v. Kraft Food Ingredients Corp.*, 203 Ill. 2d 64, 92, 783 N.E.2d 1024, 1041 (2002)) (in enacting § 5/2-1115, "the legislature was responding to a perceived crisis in the area of medical malpractice litigation"); *Barron v. Ford Motor Co. of Canada Ltd.*, 965 F.2d 195, 199 (7th Cir. 1992) ("a substantive rule is concerned with the channeling of behavior outside the courtroom"). *See also S.A. Healy Co. v. Milwaukee Metropolitan Sewerage Dist.*, 60 F.3d 305, 310 (7th Cir. 1995) (noting that in diversity cases, a state rule is substantive where, "though undeniably 'procedural' in the ordinary sense of the term, [it] is limited to a particular substantive area, such as contract law . . . For then the state's intention to influence substantive outcomes is manifest and would be defeated by allowing parties to shift their litigation into federal court").

In any event, the court finds that *Agfa-Gevaert* offers the better-reasoned approach to applying choice of law provisions to contractual disputes. It defies logic to believe that Ness Motley intended the court to determine liability based on South Carolina law but award damages according to the law of whatever state Interclaim happened to choose as its legal venue. Indeed, the contract provision broadly states that it "shall be governed and construed in all respects in accordance with the laws of the State of South Carolina" and nowhere indicates an intent to separate issues of contractual liability and damages. (PX 72.) Ness Motley's reliance on cases that found statutes

21

of limitation and attorneys' fees to be procedural does not support a contrary conclusion. *See, e.g., F.D.I.C. v. Wabick*, 335 F.3d 620, 627 (7th Cir. 2003) (applying Illinois statute of limitations to contract with Nebraska choice of law provision); *Midwest Grain Prods. of Illinois, Inc. v. Productization, Inc.*, 228 F.3d 784, 792 (7th Cir. 2000) (rules governing the award of attorneys' fees are procedural because they do not affect parties' substantive rights). Thus, the court declines to render the parties' choice of law provision "broken-backed" by separating the issues of liability and remedy. *Agfa-Gevaert*, 879 F.2d at 1525.

Anticipating this result, Ness Motley argues in the alternative that § 5/2-1115 applies to this case based on "fundamental public policy considerations." According to the firm, "Illinois' carefully considered legislative abolition of punitive damages would be rendered meaningless if private contracts could trump public policy by opting for a foreign state's substantive law, which expressed a different policy." (Def. Reply, at 28.) As noted, Illinois does have a fundamental interest in controlling malpractice litigation in the state. The perceived crisis that prompted § 5/2-1115, however, focused on medical and not legal malpractice. *See Unzicker*, 203 Ill. 2d at 92, 783 N.E.2d at 1041. Moreover, South Carolina has a materially greater interest in this litigation than Illinois. *See Maher and Associates, Inc. v. Quality Cabinets*, 267 Ill. App. 3d 69, 76, 640 N.E.2d 1000, 1006 (2d Dist. 1994). Ness Motley is a South Carolina law firm with no Illinois office, and there is no evidence that any of its attorneys reside in Illinois. The Retainer Agreement was negotiated between Ness Motley in South Carolina and Interclaim in Ireland, and most of Ness Motley's improper negotiations with Down occurred through lawyers in South Carolina. (Pl. Sur-Reply, at 21.) Illinois, on the other hand, has little interest in protecting South Carolina lawyers from paying punitive damages to clients not located in Illinois based on conduct that occurred largely outside the state. *See, e.g., International Surplus Lines Ins. Co. v. Pioneer Life Ins. Co.*, 209 Ill. App. 3d 144, 157, 568 N.E.2d 9, 16-17 (1st Dist. 1990) ("[a]pplication of Arizona law in this case

22

will have virtually no effect on the citizens of Illinois, and Illinois has little interest in regulating the conduct of insurers whose contracts relate to citizens of other States").

Having determined that § 5/2-1115 does not bar an award of punitive damages for Ness Motley's breach of contract, the court next considers Ness Motley's objection that the conflicts principle of depecage mandates the application of Illinois law to the so-called "tort portion" of the breach of contract claim. *See Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 848 (7th Cir. 1999) ("[s]ometimes it is appropriate to apply the law of more than one jurisdiction, the procedure known in conflicts-speak as 'depecage'"). Ness Motley's logic is as follows. Under South Carolina law, punitive damages are available for a breach of contract where it is accompanied by a fraudulent act. *See Floyd v. Country Squire Mobile Homes, Inc.*, 336 S.E.2d 502, 503-04 (S.C. Ct. App. 1985); *Lister v. NationsBank of Delaware, N.A.*, 494 S.E.2d 449, 454 (S.C. Ct. App. 1997). The element of the claim that gives rise to punitive damages is the "fraudulent act accompanying the breach." Because this is a tort, the court should have applied the choice of law test for torts in determining whether punitive damages were available for the breach of contract claim. *Lister*, 494 S.E.2d at 454. Under Illinois choice of law principles, "Illinois courts apply the local law of the place of the injury unless Illinois has a more significant relationship with the occurrence and with the parties." *MCI Worldcom Network Servs., Inc. v. Kramer Tree Specialists Inc.*, No. 02 C 7150, 2003 WL 22139794, at *2 (N.D. Ill. June 19, 2003) (quoting *Vickrey v. Caterpillar Tractor Co.*, 146 Ill. App. 3d 1023, 1025, 497 N.E.2d 814, 816 (4th Dist. 1986)). The injury in this case occurred in Illinois, Ness Motley argues, which does not permit punitive damages for a breach of contract even if accompanied by a fraudulent act. Thus, the punitive damage award must be vacated. (Def. Mem., at 15-19; Def. Reply, at 31-32.)

The first problem with Ness Motley's argument is that at trial, the firm conceded that South Carolina law governed the breach of contract claim and specifically agreed to a punitive damage instruction drawn from the South Carolina Code. (Tr. 2006, 2024-30.) *See* FED. R. CIV. P. 51 ("[n]o

23

party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection"). Moreover, the court disagrees that *Lister* requires the concurrent application of two separate choice of law analyses to the single breach of contract claim. The *Lister* court reviewed the trial court's application of South Carolina law in assessing punitive damages and found that regardless of which choice of law test it used – tort, contract, or Restatement – South Carolina law applied. The court did not state that it was either appropriate or necessary to simultaneously apply different choice of law tests to different elements of the breach of contract with fraudulent act claim.

Nor did Judge Posner reach such a conclusion in *Midland Mgmt. Corp. v. Computer Consoles, Inc.*, No. 87 C 0971, 1992 WL 281354 (N.D. Ill. Oct. 8, 1992), where he merely refused to apply a contractual choice of law provision to a separately alleged claim for fraud. *Id.* at *2. *See also Precision Screen Machines Inc. v. Elexon, Inc.*, No. 95 C 1730, 1996 WL 495564, at *2-3 (N.D. Ill. Aug. 28, 1996) (applying New Jersey choice of law provision to breach of contract claim but Illinois law to separate claims of trade secret misappropriation and tortious breach of a confidential relationship, both of which sounded in tort and were not dependent upon the contract). Indeed, "issue-by-issue treatment does not require the court to conduct a conflicts analysis for each and every aspect of a particular issue." *Wilkow v. Forbes, Inc.*, No. 99 C 3477, 2000 WL 631344, at *5 (N.D. Ill. May 15, 2000) (declining to treat the fair reporting privilege separately from the reach of that privilege; i.e., whether it was qualified or absolute).

In addition, "tort claims, such as fraudulent inducement, that are dependent upon a contract are subject to the contract's choice-of-law provision regardless of the breadth of the clause." *Wireless Distributors, Inc. v. Sprintcom, Inc.*, No. 03 C 2405, 2003 WL 22175607, at *6 (N.D. Ill. Sept. 19, 2003). In this case, any fraudulent acts accompanying the breach of contract were clearly dependent upon the underlying Retainer Agreement in that (1) they were based on the

construction and interpretation of the contract; (2) they were closely related to the parties' contractual relationship; and (3) they did not exist without the contractual agreement. *Id.* (Pl. Mem., at 44-46) (detailing evidence of Ness Motley's fraudulent acts). Thus, Ness Motley's objections to the exclusive application of South Carolina law to the breach of contract claim are overruled and the court declines to disturb the jury's award of punitive damages based on that claim.

### b.    Breach of Fiduciary Duty

Ness Motley also attempts to set aside the award of punitive damages to the extent it was based on the breach of fiduciary duty claim, relying once again on § 5/2-1115. (Def. Reply, at 16-23.) Illinois case law does tend to support Ness Motley's argument that the statute would bar punitive damages for such a claim. *See Calhoun*, 234 Ill. App. 3d 90, 599 N.E.2d 1318 (§ 5/2-1115 bars punitive damages in cases alleging malpractice, even if conduct was intentional or fraudulent); *Brush*, 335 Ill. App. 3d at 361, 783 N.E.2d at 80-81 (applying § 5/2-1115 to breach of fiduciary duty claim where the "injury was suffered by reason of the attorneys' professional conduct during the course of legal representation, [so] the gravamen of the claim is legal malpractice"). The court need not address this issue, however, because the jury's award can fairly be characterized as arising from the breach of contract claim, which alone supports the punitive damages award. *See Gonzales v. Checker Taxi Co.*, 165 F.3d 32 (7th Cir. 1998) ("[a]ll evidence and reasonable inferences from the evidence are construed in favor of the verdict"). Accordingly, Ness Motley's motion to vacate the award of punitive damages on this basis is denied.

### 2.    Excessiveness

Ness Motley's final argument against the punitive damages award is that it is grossly excessive and therefore violates the firm's constitutional right to due process. Ness Motley first revisits its argument that Interclaim did not suffer any harm absent a resolution of the Madison

County proceedings. (Def. Reply, at 36-38) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 123 S.Ct. 1513 (2003)) ("[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business"). As Ness Motley sees it, Interclaim failed to prove that the firm's misconduct actually harmed Interclaim because "[h]arm will only occur if there is a favorable decision in the class action suit, with a very substantial verdict that ultimately proves uncollectible in Canada." (Def. Reply, at 37-38; Def. Mem., at 29.) As explained earlier, the jury reasonably concluded that Interclaim suffered harm when, among other fiduciary and contractual breaches, Ness Motley misappropriated Interclaim's proprietary information and used it to negotiate a proposed settlement that resulted in the dissipation of $50-$60 million in assets identified, located, and frozen by Interclaim, regardless of the outcome of the Madison County litigation. (Pl. Mem., at 20-22, 44-46.) Thus, the purported lack of harm to Interclaim is not sufficient to vacate the punitive damages award. *See Bruso*, 239 F.3d at 856; *Parham*, 79 F.3d 1150 ("[g]reat deference traditionally has been accorded to a jury's verdict, and we shall not set aside the decision of a jury if a reasonable basis exists in the record to support that verdict").

The court is also unpersuaded by Ness Motley's assertion that its misconduct ranked low on a scale of reprehensibility. (Def. Reply, at 38.) "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm*, 123 S.Ct. at 1521 (quoting *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996)). In determining reprehensibility, the court must consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id*. An award is suspect if all of these factors are absent. *Id*.

The first two factors do not apply here, but Interclaim presented substantial evidence of its financial vulnerability (and that of the 29 claimants from whom it had obtained powers of attorney)

and Ness Motley's repeated and deliberate acts of deception. Ness Motley claims that it was unaware of Interclaim's financial problems or impending bankruptcy and, thus, did not prey upon a vulnerable victim. (Def. Reply, at 39.) Interclaim, however, presented evidence that Ness Motley was in fact aware of Interclaim's weak financial position when the firm was secretly negotiating with Down and agreeing to settlement terms that were unfavorable to Interclaim. (Tr. 839-44; PX 183.) Even assuming Ness Motley had no information concerning its own client's financial circumstances, the firm has not demonstrated that conduct is reprehensible only if the perpetrator knew about the victim's financial instability. (Def. Reply, at 39.) Ness Motley cites § 3A1.1(b) of the United States Sentencing Guidelines, which allows for enhanced punishment where a defendant knew or should have known of a victim's vulnerability, but criminal sentencing guidelines are simply not dispositive of this issue.

Ness Motley disputes that it engaged in "repeated tortious acts," characterizing its misconduct as "an isolated occurrence, which was effectively accomplished by September 29, 2000, when the TRO against Cindy Down was lifted." (Def. Reply, at 39-40.) To the contrary, the evidence at trial indicated that Ness Motley repeatedly deceived Interclaim and the class in negotiating a settlement with Down. Specifically, Ness Motley met and negotiated with Down's attorneys on numerous occasions without Interclaim representatives present and over Interclaim's objections, and agreed to a settlement that limited Down's financial exposure to victims; provided a $2 million fee to Ness Motley; and excluded Interclaim and the 29 victims it represented from participating in the settlement negotiations. (PX 150, 147; Tr. 364-65.) Ness Motley falsely led Interclaim to believe that it would cease negotiations with Down until it resolved any potential ethical conflicts, and then withdrew as Interclaim's counsel based on the advice of ethics experts who were not apprised of all relevant facts. (Tr. 1561-62, 1592-93; PX 169; Pl. Mem., at 10-13.) In the words of Professor Rotunda, "the rule is that you cannot fire the disfavored client. You cannot pick and choose to whom you're going to give your loyalty." (Tr. 495.)

Ness Motley ultimately opposed Interclaim's attempt to intervene in the Madison County litigation, dismissed Cindy Whitehead-Down from that case, and dissolved the TRO with respect to both Cindy and James Blair Down, which released all judicial control over the $50-$60 million in net assets frozen by Interclaim, none of which was in the best interests of the class. (Pl. Mem., at 14-15; Tr. 373, 851-52; PX 207 Attachment C.) There was evidence that this conduct violated numerous rules of professional conduct and that Ness Motley engaged in a course of conduct designed to benefit the firm and Down while harming the very clients whose interests Ness Motley was hired to represent. On these facts, the court cannot agree that the jury erred in finding Ness Motley's conduct sufficiently reprehensible to warrant punitive damages. The mere fact that other juries in other cases involving different facts – and in some cases different jurisdictions – returned smaller punitive damages awards does not establish that this verdict is unconstitutionally excessive. (Def. Reply, at 40-41, 45-46) (citing *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219 (10th Cir. 2000) (fraudulent trademark registration, trademark infringement, and unfair competition); *Southwest Whey, Inc. v. Nutrition 101, Inc.*, 188 F. Supp. 2d 986, 989 (C.D. Ill. 2002) (breach of fiduciary duty to market whey to hog farmers); *In re H. King & Associates*, 295 B.R. 246 (N.D. Ill. 2003) (breach of fiduciary duty by corporate officers who deprived company of an ongoing business opportunity and decided to liquidate); *Watkins v. Lundell*, 169 F.3d 540 (8th Cir. 1999) (breach of settlement agreement and fraud in inducing settlement); *Proctor v. Davis*, 291 Ill. App. 3d 265, 682 N.E.2d 1203 (1st Dist. 1997) (medical malpractice and products liability)).

In fact, the ratio of punitive to compensatory damages awarded by this jury is well within constitutional limits. The Supreme Court has held that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 123 S.Ct. at 1524. Here, the jury awarded $27.7 million in punitive damages and $8.3 million in compensatory damages, a ratio of approximately 3.4 to 1 – well within the constitutional guidelines set forth by the Court. *Compare State Farm*, 123 S.Ct. at 1524 ("[s]ingle-digit multipliers

are more likely to comport with due process . . . than awards with ratios in range of 500 to 1 . . . or, in this case, 145 to 1"); *Williams v. Philip Morris Inc.*, 51 P.3d 670 (Or. Ct. App. 2002) (punitive-to-compensatory ratio of 97 to 1), *vacated by* 124 S.Ct. 56 (2003); *Clark v. Chrysler Corp.*, 310 F.3d 461 (6th Cir. 2002) (punitive-to-compensatory ratio of 12.7 to 1), *vacated by* 124 S.Ct. 102 (2003); *Sawtelle v. Waddell & Reed, Inc.*, 754 N.Y.S.2d 264, 272-73 (2003) (in case alleging violation of Connecticut Unfair Trade Practices Act, punitive-to-compensatory ratio of 25 to 1 was impermissibly high and well beyond comparable awards under the statute). Significantly, in this case, the jury did not pull the $27.7 million figure out of thin air; it is the exact amount Interclaim sought as an alternative measure of compensatory damages. This court finds that "the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm*, 123 S.Ct. at 1524. Ness Motley does not deny its ability to pay this amount. Its motion to remit or vacate the punitive damages award is denied.

## CONCLUSION

For the reasons stated above, Ness Motley's Motion for a New Trial, Judgment as a Matter of Law and for a Remittitur (103-1, 103-2, 103-3) is denied.

ENTER:

Dated: January 8, 2003

REBECCA R. PALMEYER
United States District Judge

29